## HUGHES *v.* STATE BOARD OF MEDICAL EXAMINERS.

1. The ground of demurrer which raises the question that the record does not show that the demurrant was served with a copy of the charges preferred against him was properly overruled. In preferring charges against a practicing physician in order to revoke his license under the act of 1913 (Acts 1913, p. 101), as amended by the act of 1918 (Acts 1918, p. 173), it is not necessary to specify the law under which the charges are preferred.

2. The acts of 1913 and 1918, supra, are not unconstitutional and void on the ground that they are violative of the due-process clauses of the State and Federal constitutions. These acts provide for notice of time and place of hearing, for service of the notice, for the production of the defendant's evidence, and for making his defense, and also for an appeal from the State Board of Medical Examiners to a jury in the superior court; and this provides due process of law.

3. Section 14 of the act of 1918, which provides that "said appeal to be had as in other cases now provided by law," is not void for uncertainty.

4. The language in section 14 of the act of 1918, which declares that a licentiate's name may be removed from the records in the office of any

clerk of court in this State, and his license revoked upon the ground of "conviction of crime involving moral turpitude," is not so vague, uncertain, and indefinite as to render the same void. The words "moral turpitude" are capable of accurate definition. The legislature may enact that one who has been convicted of crime "involving moral turpitude" shall no longer practice medicine.

(a) The right to practice medicine is, like the right to practice any other profession, a valuable right, which is entitled to be protected under the constitution and laws of the State. But the State in the exercise of the inherent police power of the sovereign may place such restrictions on a licensee as may be necessary for the welfare and safety of society. A statute which regulates the right to practice medicine, but leaves the field open to all who possess the prescribed qualifications, does not abridge the privileges or immunities of citizens.

(b) A license to practice medicine is not a contract, and gives the licensee no right to continue in the practice in the future unrestricted, and such license may be revoked for good cause, and such revocation alone is not a taking of property without due process of law.

(c) Under the police power of the State the legislature may prohibit advertisements by licensed physicians with reference to "any disease of the sexual organs;" and provide for a revocation of the license of such practicing physician upon a majority vote of the State Board of Medical Examiners, for a violation of the above provision of the act.

(d) Neither the act of 1913, nor section 14 of the act of 1918, supra, is retroactive as applied to the facts of this case.

(e) The acts in question are not unjustly discriminatory, and do not deny to the plaintiff in error the equal protection of the laws, for any reason assigned, so as to render them void.

5. The court did not err in overruling the demurrer.

No. 5309. MAY 13, 1926. REHEARING DENIED JUNE 28, 1926.

Appeal. Before Judge Humphries. Fulton superior court. December 9, 1924.

*Norman I. Miller,* for plaintiff in error. *Alston, Alston, Foster & Moise,* for persons at interest, not parties of record.

*J. Z. Foster,* contra.

HILL, J. The State Board of Medical Examiners caused to be served upon Talbert W. Hughes, a physician who had been licensed to practice medicine in this State, a notice preferring certain charges against him, a copy of which charges it was alleged was served upon Hughes personally by the deputy sheriff of Fulton County, Georgia, on January 21, 1924, as provided by the act of 1913 (Acts 1913, p. 101), as amended by the act of 1918 (Acts 1918, p. 173). The charges preferred were: (1) conviction of crime involving moral turpitude; (2) causing the publication and circulation of an advertisement relative to diseases of the sexual

organs, and the proposed curing of the same.   Before the charges were heard Hughes filed an equitable petition in the superior court of Fulton County, to enjoin the State Board of Medical Examiners from proceeding with the hearing, alleging the unconstitutionality of the acts authorizing the hearing before the board, etc.   In that case (*Hughes v. State Board of Medical Examiners,* 158 *Ga.* 602, 123 S. E. 879), this court held that the proceeding against the licentiate was quasi criminal in character, and that a court of equity under the general rule would not enjoin prosecutions for criminal offenses or quasi criminal offenses, and affirmed the judgment of the court below in refusing to grant an injunction.   After the notice was given to the plaintiff in error and his counsel, the hearing before the State Board of Medical Examiners was had, at which time the plaintiff in error filed a demurrer and an answer, and introduced evidence in the case; after which he was found guilty on both charges.   From this judgment of the board he filed his appeal to the superior court.   On the hearing of the case in the superior court the demurrer was overruled, and the plaintiff in error excepted.

1.   The questions before this court to be decided are those raised by the demurrer.   Grounds 1, 2, 3, 4, 5, 6, and 7 challenge the sufficiency of the notice served upon the plaintiff in error, for various reasons: that the notice fails to show that a copy of the charges therein referred to is attached to such notice, as provided by section 14 of the act of 1918 (Acts 1918, p. 173); that the notice shows that a copy of the charges relied upon is not attached, but that the hearing therein referred to and proposed to be held would be upon charges served at some different time than that when service of such notice was attempted; that the contents of the notice show that the same was not given upon the preferment of the charges before the board, but that the proposed hearing would be upon charges therein alleged to have been preferred and served on January 21, 1924, some nine months prior to the date of the notice in the present case; that the notice fails to set forth or refer to the law under which the board claims to have the authority or power to give such notice summoning demurrant to appear before it, and that the same should be made to appear; that the copy of the charges served upon the demurrant was undated, unsigned, and anonymous as to who was responsible for same, by

way of recital in the body thereof, and for lack of signature thereto; that neither the notice nor the copy of charges shows any right, power, or authority by virtue of any law to receive or entertain the charges against demurrant, or to try him upon the grounds and complaints set up in the copy of the charges served upon him, or to revoke his license to practice medicine in this State. These grounds of the demurrer are without merit, and the court did not err in overruling them. The record in the case shows that in January, 1924, the plaintiff in error was served, by the deputy sheriff of Fulton County, with notice to appear before the State Board of Medical Examiners to answer certain charges as a licentiate to practice medicine in this State, a copy of which charges was attached to the notice. Following that, as stated above, the plaintiff in error filed an equitable petition to enjoin the State Board of Medical Examiners from proceeding with the hearing, and the decision in that case was adverse to the plaintiff in error. Subsequently the following notice, properly entitled, was served upon the plaintiff in error: "You are hereby notified that a hearing before the said board will be had on the second Tuesday in October, 1924 (October 14, 1924), at 10 o'clock a. m., in the Senate Chamber at the Capitol in Atlanta, Georgia, upon the charges preferred against Talbert W. Hughes, a copy of which charges was heretofore served upon Talbert W. Hughes personally by F. L. Smith, deputy sheriff of Fulton County, Georgia, on January 21, 1924; and you are hereby required to be at said hearing and show cause, if any you have, why the license of Talbert W. Hughes to practice medicine in this State should not be revoked, and his name as such licentiate be removed from the records in the office of the clerk of the superior court of Fulton County, Georgia, and from the records in the office of any other clerk of court in this State, registering him as such licentiate. This 26th day of October, 1924. State Board of Medical Examiners, by C. T. Nolan, Sec. Treasurer." A copy of the charges, the substance of which is set out above, preferred by and before the State Board of Medical Examiners, appears in the record.

Section 14 of the act of 1918, supra, provides that upon the preferment before the State Board of either of said charges above enumerated (including "conviction of crime involving moral turpitude," and "causing the publication and circulation of an ad-

vertisement relative to any disease of the sexual organs") against any licentiate or applicant for license, it shall be the duty of the said board to cause written notices of the time and place of hearing upon said charge, together with a copy of the charge preferred, to be served upon such licentiate or applicant twenty days before hearing. It is not necessary that in the notice given to the demurrant the law under which such notice is given shall be set forth. The law presumes that every one knows the law, and it is not incumbent upon the State Board of Medical Examiners to specifically state what the law is under which the notice is given. The other objection to the notice, that it was unsigned and undated, is without merit, for the copy of the notice set out in the record with it was both dated and signed.

2. Grounds 8 and 9 of the demurrer attack the constitutionality of the acts of 1913 and 1918, which latter act is amendatory of the act of 1913, on the ground that they deny to the plaintiff in error due process of law under both the State and Federal constitutions, as provided in art. 1, sec. 1, par. 3, of the constitution of Georgia, which is as follows: "No person shall be deprived of life, liberty, or property, except by due process of law;" and of the 14th amendment to the constitution of the United States, which provides, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." Section 14 of the act of 1918 (Acts 1918, pp. 173, 193), is as follows:

"Be it further enacted, that said board may refuse to grant a license to practice medicine in this State, or may cause a licentiate's name to be removed from the records in the office of any clerk of court in this State, on the following grounds, to wit: The employment of fraud or deception in applying for license or in passing the examination provided for in this act; conviction of crime involving moral turpitude; conviction for the violation of any penal provision of the 'Opium Act of 1914,' or 'Harrison Act,' also called the 'Harrison Narcotic Law;' the practice of medicine under a false or assumed name or the impersonation of another practitioner of a like or different name; habitual intemperance in the use of ardent spirits, narcotics, or stimulants to such an ex-

tent as to incapacitate him for the performance of professional duties; the procuring or aiding or abetting in procuring a criminal abortion; the obtaining of a fee on representation that a manifestly incurable disease can be permanently cured; causing the publication and circulation of an advertisement of any medicine by means whereby the monthly periods of women can be regulated, or the menses if suppressed can be re-established; causing the publication and circulation of an advertisement relative to any disease of the sexual organs. Said board may, upon satisfactory proof made that any applicant or licentiate has been guilty of any of the offenses above enumerated, refuse to grant a license to said applicant or may revoke the license of said licentiate upon a majority vote of said board. There may be an appeal from the judgment of said board by the party who is refused a license by the board, or whose license is revoked, as the case may be, if dissatisfied with the judgment, to a jury in the superior court of the county of the residence of such dissatisfied party, said appeal to be had as in other cases now provided by law. The party whose license is revoked or refused shall be liable for cost as follows: Preparing copies of notice, $2.00; procuring service of said notice, $2.00; each subpoena for witness or for the production of any book, writing, or document, 15c; transmitting appeal, $2.00; procuring cancellation of revoked license, 25c. Said board is empowered to enter up judgment for such cost as may accrue under the provisions of this act against the party liable therefor, as herein provided, and issue execution thereon, which shall bear test in the name of the president of said board and be signed by its secretary-treasurer. In all cases wherein a license has been revoked and no appeal has been entered within the time allowed by law, it shall be the duty of the secretary-treasurer of said board, immediately after the expiration of the time allowed for appeal, to transmit to the clerk of the superior court, in whose office the revoked license is recorded, a copy of the order of the said board revoking said license, certified by said secretary-treasurer, with a fee of 25c; and it shall be the duty of said clerk to cancel the record of said license by entering upon the face thereof a copy of said certified order. In a case wherein appeal proceedings are had and not sustained, the revoked license shall be cancelled in the manner above provided, immediately after the final termina-

tion of such case. The appeal herein provided for shall be had upon the payment of cost or the making of the affidavit in lieu thereof, as provided by law in other cases.

"Upon the preferment before said board of either of said charges above enumerated against any licentiate or applicant for license, it shall be the duty of said board to cause written notices of the time and place of hearing upon said charge, together with a copy of the charge preferred, to be served upon such licentiate or applicant twenty days before hearing. Said board shall prepare two copies of said written notice and attach to each of said notices a copy of the charge preferred, and cause the same to be delivered to the sheriff or his deputy of the county of the residence of the licentiate or applicant against whom charge has been preferred, together with two dollars as a fee for service, who shall within ten days deliver to such licentiate or applicant personally, or leave at the most notorious place of abode of such party, one of said notices, with a copy of said charge attached, and then return the other notice with copy charge attached thereto to said board, together with said officer's entry of service thereon. Said licentiate or applicant shall have the privilege to make defense at said hearing, either in person or by attorney, and on application to said board he shall be furnished by said board with a subpœna for any witness in his behalf, or for the production of any book, writing, paper, or document to be used in his behalf on said hearing. Said board shall have the power to compel the attendance of any witness or the production of any book, writing, or other document in the possession, custody, or control of any witness or other person, at such hearing of said board; and any witness or person refusing to produce any book, writing, or other document, or to appear to testify, without legal excuse, at such hearing of said board, after having been served with a subpœna issued by said board requiring such witness to appear, produce any book, writing, or other document, or testify at such hearing, shall be guilty of contempt, and upon certification of such act by said board to the judge of the superior court in whose jurisdiction said hearing is held or to be held, the judge shall punish the same as though committed before him.

"No license of any applicant shall be refused nor license of any licentiate shall be revoked on account of the default or failure of

the applicant or licentiate to appear, but in case of default said board may proceed with the hearing, and, upon satisfactory proof made of the truth of the charge preferred, refuse a license to the defaulting applicant or revoke the license of such defaulting licentiate, regardless of the absence at said hearing of such applicant or licentiate. However, at any time after six months from the final termination of the proceeding refusing or revoking a license, said board may, by a majority vote, issue a new license or grant a license to the person affected, restoring and conferring all the rights and privileges of and pertaining to the practice of medicine as defined and regulated by this act. Any person to whom such rights and privileges have been so restored shall pay to the secretary-treasurer a fee of twenty dollars on the issuance of a new license."

It is apparent from reading this section of the act under review that it provides for notice and time of hearing, for service of the notice, for the production of the defendant's evidence, for making his defense, and for an appeal from the decision of the State Board of Medical Examiners to a jury in the superior court. This being so, we can not hold that the act denies to the demurrant due process of law.

3. Ground 10 of the demurrer attacks that portion of section 14 of the act of 1918 where it provides for an appeal to a jury, in the following language: "said appeal to be had as in other cases now provided by law." The point is made that no time is stipulated within which the appeal must be entered, "for while code § 5000 provides for entering of appeals to superior courts within four days after the adjournment of the court in which the judgment was rendered, this can not be applied definitely to a hearing before said State Board, for as to the latter there is no 'court or adjournment' thereof." We are of the opinion that this ground of the demurrer is without merit. Under the general law every appeal must be entered to the superior court within four days; and unless there are provisions made where a greater or less time is fixed for entering appeals in particular cases, the general provision of the law in the Civil Code of 1910, § 5000, will control. When this case was before this court on the petition for injunction (158 *Ga.* 602), this court held: "As the plaintiff has adequate and complete remedies at law by which, in the first in-

stance, he can set up the alleged matters of defense before said board, and, in the second instance, by an appeal from any judgment of said board, if adverse to him, to the superior court of the county of his residence, where all such matters of defense can be set up and determined." In that case it was insisted that, in addition to the other grounds for injunction, the plaintiff had no right of appeal, the 20th paragraph, subparagraph (b), of the petition being as follows: "Said act and section 14 thereof are unconstitutional and void and contrary to the above-mentioned provision of the constitution of the State and United States, set forth in paragraphs 11 and 12, for the reason that provisions to appeal to a jury are too lacking in certainty and are too vague and uncertain and indefinite to be capable of enforcement."

4. Section 14 of the act of 1918 is attacked for the reason that the language in the act which declares that a licentiate's name may be removed from the records in the office of any clerk of court in this State, and his license revoked upon the ground of "conviction of crime involving moral turpitude" of the licentiate, is so vague, uncertain, and indefinite as to render the same void; that it is not therein defined what shall constitute "crime involving moral turpitude," and that such provision in the act fails to specify what offenses come within its terms, and therefore that the demurrant in a proceeding to revoke his license and cause his name to be removed from the records can not know from the language of the act what it covers, or be put on notice as to what the above term means; and that the attempt to try demurrant under the provision of the act of 1918, quoted above, and to revoke his license on such ground, would be violative of the provisions of art. 1, sec. 1, par. 3, of the constitution of Georgia, and of the 14th amendment of the constitution of the United States, and would subject him to the penalty for practicing medicine after the revocation of his license, thus depriving him of his liberty without due process of law, etc. It is also insisted by the demurrant that under such provision he would be precluded from having considered by the board the question of whether the alleged conviction had any bearing upon the present fitness and right of Hughes to practice his profession, the bare fact alone of conviction of a crime which the board might decide as involving moral turpitude being made the sole consideration under the act. The

demurrer also raises the question that the act is discriminatory and retroactive.

In discussing the question of the meaning of the words "moral turpitude" in the case of *Holloway* v. *Holloway*, 126 *Ga*. 459, 460 (55 S. E. 191, 7 L. R. A. (N. S.) 272, 115 Am. St. R. 102, 7 Ann. Cas. 1164), Judge Cobb said: "The Civil Code declares, among the grounds for divorce, 'the conviction of either party for an offense involving moral turpitude, and under which he or she is sentenced to imprisonment in the penitentiary for the term of two years or longer.' [1895] § 2426, par. 8. The respondent was sentenced to the penitentiary exceeding two years, and the right of the libellant to a divorce depends upon whether the offense of which he was convicted involved moral turpitude. Turpitude in its ordinary sense involves the idea of inherent baseness or vileness, shameful wickedness, depravity. Webster's International Dict. In its legal sense it includes everything contrary to justice, honesty, modesty, or good morals. Black's Law Dict.; Bouvier's Law Dict. The word 'moral' which so often precedes the word 'turpitude,' does not seem to add anything to the meaning of the term, other than that emphasis which often results from a tautological expression. All crimes embraced within the Roman's conception of the crimen falsi involve turpitude; but it is not safe to declare that such crimes only involve turpitude. Murder involves vileness and depravity; for it is the result of an abandoned and malignant heart. Voluntary manslaughter involves the intentional destruction of human life. It is true that there is no deliberation, no malice, in the act constituting the offense, but the manslayer intends to kill, and carries out the intention in an unlawful manner. It may be the result of passion or temper, and the law in its mercy visits a less penalty than that inflicted for wilful killing; but it necessarily involves the intention to unlawfully deprive another of life. Whenever one intentionally and wrongfully takes human life, he does an act which is base, vile, depraved, and contrary to good morals. That the offense of voluntary manslaughter involves moral turpitude can not admit of serious question. See, in this connection, 5 Words & Phrases, 4580." So, following the line of reasoning of Judge Cobb, we are of the opinion that the words "moral turpitude" in the act are not so vague and indefinite as to be void, but that they have

a fixed and definite meaning capable of being ascertained. In a note to the case of Green v. Blanchard, 5 A. L. R. 84, 98, quoting from State Medical Examiners v. Harrison, 92 Wash. 577 (159 Pac. 769), it is said that " 'conviction of any offense involving moral turpitude, in which case the record of such conviction shall be conclusive evidence,' . . it was held that the legislature had power to pass this law, and that it was not void because it made the record of conviction conclusive evidence. It was also held that the use of the words 'moral turpitude' did not make the statute so vague and uncertain as to render it void, as those words were capable of accurate definition and were well understood."

With reference to the criticism directed against the act that it would prevent a physician from the right to practice, though he might otherwise be qualified, and that it would deprive him of a valuable property right, it is said in 21 R. C. L. 352, II, 3, that "The right to practice medicine is, like the right to practice any other profession, a valuable property right, in which, under the constitution and laws of the State, one is entitled to be protected and secure. On the other hand the preservation of public health is one of the duties devolving on the State as the sovereign power, and the discharge of this duty is accomplished by means of the exercise of the inherent police power of the sovereign. Thus is presented a conflict between the right of a citizen to follow a profession, and the right of the State to protect the health and welfare of its citizens; but not a very serious conflict, because the outcome is always clear. Every citizen has the undoubted right to follow any lawful calling, business, or profession he may select, subject only to such restrictions as the government may impose for the welfare and safety of society. This right is one of the distinguishing features of republican institutions. Many of the occupations of life may be followed by persons, irrespective of fitness, without danger to the public health, or any detriment to the general welfare; others demand special knowledge, training, or experience; and the power of the State to prescribe such restrictions and regulations for those as, in its judgment, shall protect the people from the consequences of ignorance or incapacity, as well as of deception and fraud, has never been questioned. This is especially true with respect to the practice of medicine. Nearly every one, of necessity, consults the physician at some period of

life, but few are able to judge his qualifications in point of learning and skill; and because of the importance of the interests committed to his care, involving health and life, it is perfectly clear that the State may interfere with the right of the individual and place restrictions and regulations on the practice of medicine. A statute regulating the right to practice medicine, but leaving the field open to all who possess the prescribed qualifications, does not abridge the privileges or immunities of citizens." See Dent *v.* West Va., 129 U. S. 114 (9 S. Ct. 231, 32 L. ed. 623), and other cases cited.

It is also said in 21 R. C. L. 355, § 5: "As no one has a vested right to practice medicine free from State regulation and control, it follows that present or prior practitioners can not, against a statute which provides that they must secure a license before practicing further, raise the constitutional objection that they are being deprived of property without due process of law. Past practice of medicine can not vest in any one the right to continue free from State control. . . § 6. The relation of physician and patient is of such a confidential and serious nature, that not only the skill but also the moral character of the physician is of great importance to the interest of the patient and the State. It is important that only men of good character should practice medicine, and a State may require that an applicant for a license present a certificate of good moral character before the license will be given to him, or may rightfully determine what else shall be the evidence of that character. The immoral conduct of the applicant may bar him, even though the immorality is not directly connected with the practice of his profession, for the object sought is the protection of the home of the sick and distressed from the intrusion therein, in a professional character, of vicious and unprincipled men—men wholly destitute of all moral sensibilities. And legislation requiring such a proof of good moral character may be passed subsequent to the commission of an act which is made the evidence of good character, for such legislation is not a constitutional punishment for past offenses, is not ex post facto legislation, but merely prescribes what shall be evidence of present qualifications. (Hawker *v.* N. Y., 170 U. S. 189, 18 S. Ct. 573, 42 U. S. (L. ed.) 1002.) But where the refusal to grant a license is based on the bad character of the applicant, he is en-

titled to have notice of the reason and a hearing on the point, for this is due process of law." "§ 8. It has been asserted that the granting, by the State, of a license for an indefinite period of time to engage in a particular trade or profession is in the nature of a contract, and the licensee is thereby vested with the right to continue in such trade or profession. This position, however, is not tenable, and is based on an erroneous idea of the rights conferred by such a license. The granting of a license in such a case is merely the means taken by the State, in the exercise of its police power, to regulate and restrict the engaging in certain professions and occupations, for the public good, and confers upon the licensee no rights whatever in the way of a contract with the State. He takes the same subject to the right of the State, at any time that the public good demands, to make further restrictions and regulations thereto; and if such restrictions and regulations are reasonable, they will be upheld, even though they may actually prohibit some people from further engaging in such occupations or professions under a license previously granted." Reetz *v.* Michigan, 188 U. S. 505 (23 S. Ct. 390, 47 U. S. (L. ed.) 563). "§ 9. Since a license is not a contract and gives the holder no right to continue in the practice in the future unrestricted, it follows that any license may be revoked for good cause, and that such revocation alone is not a taking of property without due process of law. . . The fact that the act of immorality, which is made the grounds for the revocation, was done prior to the passage of the statute making it such, does not render that statute an ex post facto law; for the license is revocable, not as a punishment for a past act, but because of present bad character or immorality of which the past act is made the evidence. . . § 10. Another example of conduct, on the part of physicians, that is often put under the ban, not because it happens to be unprofessional, but because it is dangerous to the community, is the solicitation of patients by means of agents or deceptive advertising. The solicitation of patients by paid agents may clearly be harmful to a community, for it may tempt the physician, or his agents, to discover ailments where none exist. And, as deceptive advertising tends not only to the detriment of the bodies of the people of a community but also to the promotion and increase of fraud, its prohibition is doubly justified. Such deceptive advertising by

physicians is generally prohibited, as, for example, in the case of a statute authorizing the revocation of a license because of the licensee's advertising cures of 'chronic and incurable diseases,' or of advertising under an assumed name. . . Another and entirely different sort of medical advertising which may be prohibited is that which, though not deceptive, tends to offend the sense of public decency and good morals. Necessarily it is hard to draw a line and say just what advertising may have such a tendency. Some authorities say, for example, that all advertisements relative to venereal diseases may be prohibited, while others are found to the effect that such diseases may be inoffensively described, and that the prohibition of all advertisements relating thereto is unreasonable." For a further discussion of the question of procedure before or against medical boards, and of due process of law, see 21 R. C. L. 367, § 13.

In the case of Hawker v. New York, 170 U. S. 189, 192 (supra), Mr. Justice Brewer, speaking for the court, said: "No precise limits have been placed upon the police power of a State, and yet it is clear that legislation which simply defines the qualifications of one who attempts to practice medicine is a proper exercise of that power. Care for the public health is something confessedly belonging to the domain of that power. The physician is one whose relations to life and health are of the most intimate character. It is fitting that not merely should he possess a knowledge of diseases and their remedies, but also that he should be one who may safely be trusted to apply those remedies. Character is as important a qualification as knowledge; and if the legislature may properly require a definite course of instruction, or a certain examination as to learning, it may with equal propriety prescribe what evidence of good character shall be furnished. These propositions have been often affirmed. In Dent v. West Virginia, 129 U. S. 114, 122 [supra], it was said, in respect to the qualifications of a physician: 'The power of the State to provide for the general welfare of its people authorizes it to prescribe all such regulations as, in its judgment, will secure or tend to secure them against the consequences of ignorance and incapacity as well as of deception and fraud.' We note also these further declarations from State courts: In State v. State Medical Examining Board, 32 Minn. 324, 327 [20 N. W. 238, 50 Am. R. 575], it was said:

'But the legislature has surely the same power to require, as a condition of the right to practice this profession, that the practitioner shall be possessed of the qualification of honor and good moral character, as it has to require that he shall be learned in the profession. It can not be doubted that the legislature has authority, in the exercise of its general police power, to make such reasonable requirements as may be calculated to bar from admission to this profession dishonorable men, whose principles or practices are such as to render them unfit to be entrusted with the discharge of its duties.' In Thompson *v.* Hazen, 25 Maine, 104, 108: 'Its authors were careful that human health and life should not be exposed without some restraint, by being committed to the charge of the unprincipled and vicious. . . It could not have been intended that persons destitute of the moral qualifications required should have full opportunity to . enter professionally the families of the worthy but unsuspecting, be admitted to the secrets which the sick chamber must often entrust to them.' In State *v.* Hathaway, 115 Missouri, 36, 47 [21 S. W. 1081]: 'The legislature, then, in the interest of society and to prevent the imposition of quacks, adventurers, and charlatans upon the ignorant and credulous, has the power to prescribe the qualifications of those whom the State permits to practice medicine. . . And the objection now made, that because this law vests in this board the power to examine not only into the literary and technical acquirements of the applicant, but also into his moral character, it is a grant of judicial power, is without force.' In Eastman *v.* State, 109 Ind. 278, 279 [10 N. E. 97, 58 Am. R. 400]: 'It is, no one can doubt, of high ·importance to the community that health, limb, and life should not be left to the treatment of ignorant pretenders and charlatans. It is within the power of the legislature to enact such laws as will protect the people from ignorant pretenders, and secure them the services of reputable, skilled and learned men.' In State *v.* Call [121 N. C. 643], 28 S. E. 517: 'To require this is an exercise of the police power for the protection of the public against incompetents and impostors, and is in no sense the creation of a monopoly or special privileges. The door stands open to all who possess the requisite age and good character, and can stand the examination which is exacted of all applicants alike.'

"But if a State may require good character as a condition of

the practice of medicine, it may rightfully determine what shall be the evidences of that character. We do not mean to say that it has an arbitrary power in the matter, or that it can make a conclusive test of that which has no relation to character, but it may take whatever, according to the experience of mankind, reasonably tends to prove the fact and make it a test. County Seat of Linn County, 15 Kansas, 500, 528. Whatever is ordinarily connected with bad character, or indicative of it, may be prescribed by the legislature as conclusive evidence thereof. · It is not the province of the courts to say that other tests would be more satisfactory, or that the naming of other qualifications would be more conducive to the desired result. These are questions for the legislature to determine. 'The nature and extent of the qualifications required must depend primarily upon the judgment of the State as to their necessity.' Dent v. West Virginia, supra, p. 122. It is not open to doubt that the commission of crime, the violation of the penal laws of a State, has some relation to the question of character. It is not, as a rule, the good people who commit crime. When the legislature declares that whoever has violated the criminal laws of the State shall be deemed lacking in good moral character, it is not laying down an arbitrary or fanciful rule—one having no relation to the subject-matter, but is only appealing to a well-recognized fact of human experience; and if it may make a violation of criminal law a test of bad character, what more conclusive evidence of the fact of such violation can there be than a conviction duly had in one of the courts of the State? The conviction is, as between the State and the defendant, an adjudication of the fact. So if the legislature enacts that one who has been convicted of crime shall no longer engage in the practice of medicine, it is simply applying the doctrine of res judicata and invoking the conclusive adjudication of the fact that the man has violated the criminal law, and is presumptively, therefore, a man of such bad character as to render it unsafe to trust the lives and health of citizens to his care."

Ground 9 of the demurrer challenges the legality of the acts of 1913 and 1918, on the ground that there is no provision in the acts creating the board as to who shall prefer charges against a licentiate. This ground is without merit.

The 15th ground of the demurrer attacks the acts of the legis-

ture under consideration, and alleges that the legislature has no power to confer the authority upon a board of medical examiners to deny the plaintiff in error as a practicing physician the right to advertise his business—that the statute makes the same an offense only against physicians, and that it is therefore class legislation and discriminatory, and is violative of the 14th amendment to the constitution of the United States, and of the constitution of the State of Georgia, in that the act denies to the plaintiff in error the equal protection of the law. It will be seen from reading the act that it bears equally upon the same class of persons designated in section 15 of the act; and this court has held that a statute bearing alike on all individuals of each class does not deny the equal protection of the law. *Arthur* v. *State,* 146 *Ga.* 827 (2), 829 (92 S. E. 637); 3 Cum. Supp. Enc. Dig. Ga. R. 932, and cases cited. We are of the opinion that the act in question does not deny to the plaintiff in error the equal protection of the laws, and that the classification made in the act is not arbitrary, but is a reasonable one made for the protection of the citizens of the State.

The question of the regulation of the professional conduct of doctors and of their fees is not of recent origin. "The oldest code of laws in the world" of which we are aware, promulgated by Hammurabi, King of Babylon, B. C. 2285-2242, published by T. & T. Clark, Edinburgh, 1905, and which was discovered on a buried monument, or block of black diorite, nearly eight feet high, by an archæologist in 1902 in Babylonia, and which has been translated and published, contains the following:

"215. If a doctor has treated a gentleman for a severe wound with a bronze lancet and has cured the man, or has opened an abscess of the eye for a gentleman with a bronze lancet and has cured the eye of the gentleman, he shall take ten shekels of silver." (A shekel of silver is equivalent to about 62 1/2 cents.)

"216. If he [the patient] be the son of a poor man, he shall take five shekels of silver.

"217. If he be a gentleman's servant, the master of the servant shall give two shekels of silver to the doctor.

"218. If the doctor has treated a gentleman for a severe wound with a lancet of bronze and has caused the gentleman to die, or has opened an abscess of the eye for a gentleman with the bronze

lancet and has caused the loss of the gentleman's eye, one shall cut off his hands.

"219. If a doctor has treated the severe wound of a slave of a poor man with a bronze lancet and has caused his death, he shall render slave for slave.

"220. If he has opened his abscess with a bronze lancet and has made him lose his eye, he shall pay money, half his price.

"221. If a doctor has cured the shattered limb of a gentleman, or has cured the diseased bowel, the patient shall give five shekels of silver to the doctor.

"222. If it is the son of a poor man, he shall give three shekels of silver.

"223. If a gentleman's servant, the master of the slave shall give two shekels of silver to the doctor."

From what has been said above and the authorities cited, we are of the opinion that the grounds of the demurrer are without merit, and the court did not err in overruling the same.

*Judgment affirmed. All the Justices concur, except Atkinson, J., disqualified.*