### 33446. COBB COUNTY-KENNESTONE HOSPITAL AUTHORITY v. PRINCE et al.

BOWLES, Justice.

This is an appeal from an order of the Superior Court of Cobb County which declared a resolution of the Cobb County-Kennestone Hospital Authority void and continued in effect a temporary injunction.

Appellant, defendant below, is a hospital authority organized under the Hospital Authorities Law (Code Ann. § 88-1801 et seq.), and operates the Kennestone Hospital in Cobb County, Georgia. The appellees, plaintiffs below, are three neurologists and two neurosurgeons licensed by the State of Georgia to practice medicine pursuant to Code Ann. § 84-901 et seq., and are members of the medical staff of the Kennestone Hospital. As members of the hospital's medical staff, each of the appellees agreed in writing "to abide by the by-laws of the medical staff and such rules and regulations as may be from time to time enacted."

In October of 1975, the appellees began discussing among themselves the possibility of forming a group to purchase a computer assisted tomoscope (C. A. T.), hereinafter referred to as a brain scanner.[1] On October 14, 1975, representatives of this group met with

---

[1] A computer assisted brain tomoscope is a tool for the

representatives of the administrative staff of the Kennestone Hospital. At this meeting, appellees proposed that they be allowed to lease space within the hospital in order to operate the equipment which they proposed to purchase.[2] At an executive session of the Hospital Authority held on October 16, 1975, it was brought to the Authority's attention that a request had been received from appellees for permission to rent space in the hospital for the purpose of installing a brain scanner. The Authority elected to uphold their policy of not renting space to private, for-profit enterprises, and, therefore, denied the appellees' request. At that meeting the Authority did, however, indicate that consideration would be given the hospital providing these services if the need was apparent.

On October 28, 1975, appellees met with members of the Kennestone Hospital Administration and members of the appellant Hospital Authority, at which time it was explained to appellees that the hospital was prohibited from leasing space to for-profit entities for the private practice of medicine.[3] At that meeting a counter-proposal was made that appellees purchase the brain scanner and lease it to the hospital, allowing the hospital to exercise full managerial control over the operation of the equipment.[4] Appellees elected to reject appellant's

diagnosis of disorders of the brain. It uses a computer to analyze information produced by x-rays and prints out a picture of the brain. The machine makes an x-ray slice through the brain and feeds this information into the computer. The information is then processed by the computer and is printed out as a pattern of numbers corresponding to various types of brain tissue.

[2] By letter dated October 23, 1975, the appellees made a formal request to the Kennestone Hospital Administration to lease space for the installation of a brain scanner.

[3] Public Health Services Health Grants Manual § 24-2.3(Y) and (Z).

[4] Section 24-2.3(Z) of the Public Health Services Health Grants Manual authorizes such an arrangement,

counter-proposal and instead decided to go ahead with the purchase of the brain scanner and to place the equipment at a location outside the hospital complex.

At the Hospital Authority's executive session of November 20, 1975, the Authority elected to initiate administrative procedures necessary to gain approval from local and state planning agencies for the purchase of a brain and body scanner, and on December 12, 1975, the Administration of the Kennestone Hospital issued a memorandum to all medical staff members announcing its intent to acquire a total body C. A. T. scanner.[5]

Thereafter, the appellees finalized negotiations with the EMI Company for the purchase of a CT 1010 brain scanner and on February 4, 1976, submitted their formal offer to EMI for its purchase. The scanner was delivered to appellees in December of 1976, but was not made operational until February of 1977. At the Hospital Authority's executive session of March 18, 1976, the purchase of an EMI CT 5005 whole body scanner was approved. At that meeting the Authority further made clear that "upon such time as [their] scanner is made operational and consistent with existing policies established by the Authority, patients will not be allowed to go outside the hospital for treatment services offered in the hospital."

On January 20, 1977, the Hospital Authority passed the following resolution which is the subject of this lawsuit: "It is the general policy of Kennestone Hospital that if a treatment, procedure, diagnostic test or other service is ordered for a patient of Kennestone Hospital, *and that procedure, test or service is routinely offered by the Hospital,* then the patient will receive that service within

---

"provided the hospital retains authority to control the purposes for which the space is utilized in order to insure that services to be provided in such space are consistent with the needs and requirements of the hospital and the community which it serves."

[5]A total body scanner takes x-ray scans of the whole body, including the brain.

the confines of the Hospital complex."[6]

When appellees' scanner became operational in February of 1977, the hospital, not routinely offering this same service within its own facility, allowed appellees to transport in-patients from the hospital to appellees' facility for testing. See footnote 6. As was the custom for any in-patient temporarily leaving the hospital, the patient was requested to sign a form releasing the hospital from liability for any injury which occurred as a result of their leaving for such testing. This practice continued until May of 1977, when the hospital's brain and body scanner became operational. Thereafter, patients transferred from the hospital to appellees' facility for brain scans were informed of the hospital's policy of January 20, 1977, and requested to sign a special release form.[7]

On June 17, 1977, appellees were notified in writing by the Hospital Authority of their violation of hospital policy,[8] and informed appellees that continued violations would result in the reconsideration of their medical staff privileges at Kennestone Hospital which had previously been granted by the Authority.

---

[6]That resolution further provides that "the hospital recognizes that occasionally a service will be ordered for a patient which, because of its specialized nature, limited application or current distribution is only offered by another facility. If it becomes necessary for a patient to receive such a service at another facility, the patient will be requested to sign a transportation release in accordance with existing hospital policies."

[7]This form differed from previous release forms in that it recited the hospital policy which was being violated and released the hospital from any liability resulting from such violation.

[8] The June 17, 1977 letters outlined reasons for the adoption of the January 20, 1977 resolution which were as follows: "(1) To eliminate inconvenience and confusion to the patients; (2) To avoid the potential of jeopardizing the seriously ill patients by transferring them outside the hospital; (3) To preclude undue expense accruing to the

Shortly thereafter, appellees filed suit against the appellant Hospital Authority in three separate counts, seeking declaratory judgment, injunctive relief and damages arising out of the Hospital Authority's adoption of the January 20, 1977 resolution. In particular, appellees alleged that said resolution was void and of no effect in that it was arbitrary and unreasonable. A temporary restraining order was issued which enjoined the appellant Hospital Authority from enforcing the resolution and revoking or reconsidering appellees' privileges to practice medicine at the hospital.

Following hearing, the trial court continued in effect the temporary restraining order and declared the Hospital Authority's resolution void as discriminatory and unreasonable in that said resolution limited the medical discretion of the physician in the exercise of his medical skills. Appellant Hospital Authority appeals. We reverse.

1. This appeal represents a classic confrontation between two entities who play major roles in the health and welfare of the citizens of our state. The relationship which exists between hospital and physician is delicate, each one exercising exclusive as well as concentric areas of responsibility in the treatment and diagnosis of patients. In addition to the roles played by these two entities in providing this essential health service, the state has the duty of monitoring this function in order to protect the health and welfare of its citizens. "[T]he preservation of public health is one of the duties devolving on the state as the sovereign power, and the discharge of this duty is accomplished by means of the exercise of the inherent police power of the sovereign." *Hughes v. State Bd. of Medical Examiners,* 162 Ga. 246, 256 (134 SE 42) (1926); *Yeargin v. Hamilton Memorial Hospital,* 225 Ga. 661 (171 SE2d 136) (1969). As such, the legislature has seen fit to endow both physician and hospital with certain

---

patient; (4) To reduce the potential of unnecessary liability to the hospital and physicians; and (5) To insure continuation of the hospital's ability to provide proper service and facilities."

rights and restrictions in order to protect our citizens in the exercise of this essential health function.

By statute, the physician is the only one empowered to practice medicine. Code Ann. § 84-901 et seq. Without his medical skills a hospital would cease to exist. On the other hand, the hospital provides the physician with a place to practice his art of healing and provides the equipment necessary to put his skills in motion. In providing for the health and welfare of the community, the legislature created hospital authorities in order to promulgate rules and regulations, "necessary and convenient to carry out and effectuate" their purposes. Code Ann. § 88-1801 et seq. This court has, in the past, noted that, "[T]he Hospital Authorities Law is replete with safeguards and controls on the operation of the hospital to insure that the public interest in the hospital ... is protected." *Bradfield v. Hospital Authority,* 226 Ga. 575, 584 (176 SE2d 92) (1970).

Part of the responsibilities of a hospital authority is to insure that an adequate, competent medical staff serves the patients within the hospital. "It is generally agreed that the managing authorities of a hospital, under the power to adopt reasonable rules and regulations for the government and operation thereof, may, in the absence of any statutory restriction, prescribe the qualifications of physicians or surgeons for admission to practice therein." *Yeargin v. Hamilton Memorial Hospital,* 229 Ga. 870 (3) (195 SE2d 8) (1972); *Dunbar v. Hospital Authority of Gwinnett County,* 227 Ga. 534 (1) (182 SE2d 89) (1971). It naturally follows that a hospital authority has the power to revoke the staff privileges of a physician whom the Authority finds to be incompetent or who fails to comply with the reasonable rules and regulations as promulgated by the Authority. *Yeargin,* supra. Much of what the Hospital Authority regulates affects, to some degree, the physician's exercise of his medical judgment. The decision of what brand of thermometer, what type of syringe or, in this case, which type of C. A. T. scanner should be utilized by the hospital for its patients are administrative decisions.[9] The

---

[9]As noted in the trial court's order "Expert testimony

physician's diagnosis is based upon his observations of the patient, tests performed and results reported to him by others. For example, a hospitalized patient may have his temperature and blood pressure taken and recorded by a nurse; a blood sample extracted and analyzed by a technician, utilizing the hospital's laboratory facilities; and may be x-rayed by a radiologist through use of equipment within the confines of the hospital facility. Although it is the physician who orders these tests and eventually evaluates their results applying his expert medical knowledge in arriving at his diagnosis, it is not the physician who undertakes their performance. The physician works within the hospital and relies upon it to provide diagnostic services, in return, agreeing to abide by the reasonable rules and regulations as set forth in the by-laws which the hospital enacts for its smooth operation.

Appellees contend that the decision as to what diagnostic techniques the patient requires is purely a medical function not to be controlled by the Hospital Authority. They argue that the resolution in issue restricts and controls their medical judgment and is, therefore, void. This argument fails for the reason that there is a distinction between the making of a diagnosis, which we recognize as a medical function, and the selection of equipment to be used in deriving information for submission to the physician in order that he be able to make his diagnosis, which is an administrative function.

The trial court made no ruling as to which machine,

---

and documentary evidence has been presented by both sides to the effect that: for plaintiffs, the CT 1010 dedicated brain scanner is inadequate for their purposes; and for the defendants, that their CT 5005 body scanner is comparable and should be used for brain scans of hospital in-patients. In light of the court's holding that this is a medical question, the court deems it unnecessary to make a holding as to this controversy." We assume for purposes of this appeal that both scanners fulfill the same function and for diagnostic purposes are comparable.

the hospital's or physicians', was superior, or for that matter, if they differed at all. Therefore, for diagnostic purposes the physicians are not restricted by their use of the hospital's machine, and the resolution which requires them to use the hospital's facilities does not, in any way, curtail their medical judgment.

In our opinion, the challenged resolution is an administrative policy adopted by the Hospital Authority pursuant to the power vested in them by the legislature under Code Ann. § 88-1801 et seq., in furtherance of the administration, operation, maintenance and control of the hospital and, accordingly, the function of this court is limited to a determination of whether the Hospital Authority's action in adopting the resolution was arbitrary and unreasonable. Sosa v. Board of Managers of Val Verde Memorial Hospital, 437 F2d 173 (5th Cir. 1971); Woodbury v. McKinnon, 447 F2d 839 (5th Cir. 1971); Jackson v. Fulton-DeKalb Hospital Authority, 423 FSupp. 1000, 1003 (1976). In deciding this question we may not substitute our judgment for that of the Hospital Authority on matters relative to policy or good practice, which are purely administrative rather than legal in nature.

Although this is an issue of first impression in this state, there have been several cases decided in other jurisdictions where physicians have attempted to overturn administrative decisions concerning the management and treatment of patients within a hospital. In each of these cases, a hospital has restricted the operation and use of certain hospital equipment to an individual physician or group of physicians to the exclusion of other physicians on the hospital's medical staff. In each case, the hospital's decision was upheld. In doing so, the courts have repeatedly rejected arguments that such arrangements were arbitrary or unreasonable, that they interfered with the rights of the physicians to practice medicine, that they denied the patient the right to select his own physician, that they constituted the unauthorized practice of medicine, or, that they otherwise intruded upon the doctor-patient relationship.

Recently, in one such case, the Colorado Supreme Court upheld the right of a hospital to limit the

professional judgment of a physician in the diagnosis and care of his patients. Radiology Professional Corp. v. Trinidad Area Health Assn., Col. Sup. Ct. C-1235, Dec. 4/17/78. The Colorado court recognized that "The ability of a physician to exercise his professional judgment in the diagnosis and care of his patients is well established and should be protected against unreasonable interference. When professional consultation is desirable or necessary, the physician should be permitted to determine who should be consulted in the best interest of his patient's health." With these considerations in mind, however, the court concluded that "[T]he physician's right may be contractually limited or waived by physicians who are associated with hospitals or clinics. Various services traditionally provided by specialists operating hospital specialty departments may be difficult to obtain on a regular basis unless the hospital enters into an exclusive contract. Contracts which limit the use of a hospital's facilities to certain specialists *or which provide that all services of a particular type required by hospital patients be performed by the contracting specialists have been upheld by courts which have considered their validity.* Dattilo v. Tucson General Hospital, 23 Ariz. App. 392 (533 P2d 700) (1975); Adler v. Montefiore Hospital Association of Western Pennsylvania, 453 Pa. 60 (311 A2d 634) (1973), cert. denied. 414 U. S. 1131 (94 S.Ct. 870, 38 L.Ed2d 755) (1974); Letsch v. Northern San Diego County Hospital District, 246 Cal. App. 2d 673, 55 Cal. Rptr. 118 (1966); Blank v. Palo Alto-Stanford Hospital Center, 234 Cal. App. 2d 377, 44 Cal. Rptr. 572 (1965); Benell v. City of Virginia, 258 Minn. 559 (104 NW2d 633) (1960).

"None of the above cited cases have held that a physician's right to select professional consultants for his patients is unreasonably limited by exclusive service contracts. *Practical considerations of hospital operation permit hospital administrators to conclude that specialty services can best be provided by entering into exclusive medical service contracts. The physician's right relating to professional consultation is, in this context, subject to reasonable limitation or waiver."* (Emphasis supplied.) Radiology Professional Corp. v. Trinidad Area Health Assn., supra.

In reaching a decision in Radiology Professional Corp. v. Trinidad Area Health Assn., supra, the Colorado Supreme Court cited with approval Benell v. City of Virginia, 258 Minn. 559 (104 NW2d 633) (1960) and Adler v. Montefiore Hospital Assn. of W. Pa., 453 Pa. 60 (311 A2d 634) (1973), cert. den. 414 U. S. 1131 (94 SC 870, 38 LE2d 755) (1974). These two decisions are typical of those being decided in other jurisdictions throughout the country.[10] In Benell, supra, a physician who was a specialist in radiology sued for declaratory judgment that a hospital board's resolution which granted exclusive use of x-ray equipment to the hospital's radiologists was invalid. The Supreme Court of Minnesota held that the resolution was not arbitrary or unreasonable, was an administrative action in furtherance of the operation and control of the hospital, and did not invade the right of an individual patient to select his own physician or compel the latter to yield to another's decision in the patient's treatment. In reaching their decision, the Minnesota Supreme Court found the hospital's resolution to be "administrative" in nature and, therefore, not subject to judicial intervention.

In Adler v. Montefiore Hospital Assn. of W. Pa., supra, a physician specializing in cardiology challenged a

---

[10]Others include Blank v. Palo Alto-Stanford Hospital Center, 234 Cal. App. 2d 377 (44 Cal. Rptr. 572) (1965) (exclusive contract method of operating a diagnostic x-ray department was reasonable and proper); Dattilo v. Tucson General Hospital, 23 Ariz. App. 392 (533 P2d 700) (1975) (contract under which two doctors had been given exclusive right to provide nuclear medical services at the hospital was necessary for proper patient care, did not unreasonably interfere with internists' practice of medicine and was not a restraint of trade); and Letsch v. Northern San Diego County Hospital District, 246 Cal. App. 2d 673 (55 Cal. Rptr. 118) (1966) (closed staff method of operating radiology department was not unreasonable, or arbitrary and does not interfere with physician's right to practice medicine).

hospital regulation which denied him the use of certain hospital equipment for cardiac catherizations and permitted only the full-time laboratory director to perform such procedures. In reaching a decision that the regulation did not violate due process or equal protection, did not deny qualified physicians the right to treat patients in the hospital or the corresponding right of the patient to choose his own physician, and did not impair the physician-patient relationship, the Pennsylvania Supreme Court recognized that, "[T]he task facing a hospital which attempts to provide comprehensive medical services is complex. Under the regulations in force at Montefiore, similar to those of other like hospitals, one's personal physician is not the operator in various areas of diagnosis and care, including *radiology,* pathology, anesthesiology, the coronary care unit, and the nuclear medicine unit, as well as the laboratory here in question. To require that the procedures administered in these departments shall be performed by hospital-designated operators is not to deny the appellant or any other qualified staff physician the right to treat his patient in the hospital, or the corresponding right of a patient to the choice and general services of his own physician. [Cit.] In short, there is no right of which we are aware that would permit a patient to insist on his own doctor's performance of the procedures conducted in a laboratory or other facility furnished, equipped and staffed by the hospital. [311 A 642] . . . Our decision merely recognizes the difficulty and complexity of the task facing a large hospital attempting to provide comprehensive medical services. Many of the procedures which in the past were performed by a physician of the patient's choice must today be handled by hospital-employed specialists. *In light of such developments, the personal desires of [the physician] must yield to reasonable rules and regulations intended alike for the benefit of patients and their doctors, . . . and the hospital and the public it serves."* (Emphasis supplied.) Id. p. 645.

The above cited cases and the instant case are strikingly similar and we find these cases to be persuasive authority to a decision in this case. In each of the above cited cases, the courts of our sister states have upheld a

hospital's decision which required in-patients to receive services from one physician or group of physicians to the exclusion of other medical-staff members. The rationale used by the courts of these states in upholding such decisions applies equally to the resolution involved in this dispute.

The Hospital Authority's resolution requiring use of in-house facilities and services for hospitalized patients rather than permitting them to be taken from the hospital to utilize like facilities or services elsewhere is reasonable and reflects a well intentioned effort by the Authority to deal with the intricate and complex task of providing comprehensive medical services to the citizens of our state. The preeminent consideration in the adoption of such a resolution by the Authority was the health, welfare and safety of the patient. (See footnote 8). The Authority's resolution is a reasonable and rational administrative decision enacted in order for the Authority to carry out the legislative mandate that it provide adequate medical care in the public interest. The resolution does not invade the physician's province. Although he is required to use the facilities and equipment provided within the hospital complex for testing rather than similar facilities and equipment outside, he is nevertheless free to interpret the results of such tests and free to diagnose and prescribe treatment for all his patients.

2. In their complaint, appellees prayed that appellant Hospital Authority be ". . . temporarily restrained and permanently enjoined from . . . enforcing said *void* resolution and . . . in suspending, revoking, or reconsidering their rights and privileges to practice medicine at said [appellant's] facility." The trial court, *after finding the resolution to be void,* exercised its discretion and continued in effect the previously granted temporary injunction in order to maintain the status quo between the parties.

Having found the resolution in question to constitute a *valid* exercise of the Hospital Authority's power, it follows that the trial court's continuance of the temporary injunction, on grounds that the resolution was *void,* was error.

*Judgment reversed. All the Justices concur.*

ARGUED APRIL 11, 1978 — DECIDED SEPTEMBER 7, 1978—
REHEARING DENIED SEPTEMBER 26, 1978.

*Jones, Bird & Howell, Jack Spalding Schroder, Jr.,
Dow N. Kirkpatrick, II, Holcomb & McDuff, Frank D.
Holcomb, Clinton A. Harkins, Barnes & Browning, Roy E.
Barnes,* for appellant.

*J. Milton Grubbs, Jr., Adele Platt Grubbs,* for
appellees.

*Erwin, Epting, Gibson & McLeod, Larry V. McLeod,
Jay H. Hedgepeth, Hansell, Post, Brandon & Dorsey,
Trammell E. Vickery,* amicus curiae.