A05A0473, A05A0474. WHITAKER v. HOUSTON COUNTY HOSPITAL AUTHORITY et al.; and vice versa.

(613 SE2d 664)

BLACKBURN, Presiding Judge.

Following a jury trial in Case No. A05A0473, Dr. James Q. Whitaker appeals the jury's award of attorney fees and punitive damages to the Houston County Hospital Authority (HCHA), contending that the trial court erred by denying his motions for judgment notwithstanding the verdict (j.n.o.v.) because the jury's awards were improperly made in the absence of nominal or compensatory damages. Whitaker also appeals the trial court's judgment finding that he no longer had any privileges to practice medicine of any type at the Houston Medical Center (the Medical Center), one of HCHA's facilities. For the reasons set forth below, we affirm this case in part and reverse in part.

In Case No. A05A0474, HCHA cross-appeals the trial court's denial of its request for additional attorney fees pursuant to both OCGA §§ 9-15-14 (attorney fees imposed for filing nonjusticiable claim) and 9-11-37 (c) (attorney fees imposed when a party fails to admit the genuineness of any document or the truth of any matter). For the reasons set forth below, we affirm the trial court's determination in HCHA's cross-appeal.

Viewed in the light most favorable to the jury's verdict, the record shows that the Medical Center is a public hospital operated by HCHA. Whitaker became a member of the Medical Center's staff in 1975 and was given privileges to practice pathology services as well as certain nonpathology-related services including forensic radiology, blood transfusion, and bone marrow aspiration services.[1] Beginning in 1994, the Medical Center entered into a contract with Whitaker's corporation, Pathology Institute of Middle Georgia (PIMG), whereby PIMG became the exclusive provider of pathology services for the Medical Center.[2]

---

[1] Whitaker also began serving as Medical Examiner for Houston County in 1975 and continues to hold that position.

[2] Dr. Charles P. Maurizi was also an employee of PIMG.

Pursuant to this contract, each doctor employed by PIMG, including Whitaker, was required to individually sign a contract addendum which stated, in relevant part:

> I will resign my membership in the Medical Staff of the Hospitals and my privileges at the Hospitals within ten (10) days after the effective date of such expiration or termination [of the contract]. If I fail or refuse to resign as described in the preceding sentence, the [Hospital] shall be entitled to terminate my ... membership and privileges. ... I expressly waive any procedural due process rights or any other right to any challenge or review under the Bylaws of said Medical Staffs or otherwise of any resignation or other termination of my ... membership or privileges pursuant to the terms of this instrument.

In addition, the contract stated that, should it "expire for any reason, [the contracting doctor] will not interfere with any attempt by the Hospital to contract with any other individual or entity for the provision of pathology services." Finally, the addendum provided that, during the term of the contract, each PIMG physician was restricted to performing pathology services at the Medical Center with the exception for "such other activities as may from time to time be consented to by the Chief Executive Officer."[3]

This contract, which had an initial four-year term, was renewed for an additional three years prior to its natural expiration in 1998. Again, in April 2001, the contract was extended for an 18-month term. In this contract, Whitaker agreed to be bound by the addendum which, as specifically found by the jury in a special interrogatory, he individually signed.[4]

Prior to the expiration of this last contract extension in October 2002, Whitaker entered into negotiations with the Medical Center for a new contract extension. The Medical Center offered to renew the contract with PIMG for one year, but Whitaker rejected this offer. Thereafter, the Medical Center entered into an exclusive contract with Southeastern Pathology Associates of Central Georgia (Southeastern Pathology) for pathology services at the Medical Center.

Before PIMG's contract with the Medical Center expired, Whitaker formed a new corporation named Maurizi, Whitaker & Associates (M, W & A), and he distributed a memorandum to staff members

---

[3] HCHA does not contend that Whitaker's nonpathology privileges had not been previously approved.

[4] At trial, Whitaker contended that he did not sign or did not remember signing the addendum. A copy of the executed contract was never recovered or found.

of the Medical Center's lab to implement a schedule for specimens to be conveyed to M, W & A, despite the noninterference provisions of the contract with the Medical Center. After PIMG's contract with the Medical Center expired, Whitaker continued to solicit pathology work from the Medical Center through M, W & A. In addition, Whitaker did not resign from the Medical Center staff or give up his privileges within ten days in accordance with the addendum to the 2001 contract. As a result, the Medical Center subsequently terminated Whitaker's staff membership and revoked all of his privileges for both pathology and nonpathology services on October 14, 2002.

In response to his termination, Whitaker filed suit against HCHA,[5] alleging that the Medical Center had inappropriately revoked all of his privileges in violation of its bylaws and Georgia public policy.[6] In Case No. A05A0474, HCHA responded, counterclaiming, among other things, that Whitaker breached the 2001 contract, defrauded HCHA, and tortiously interfered with its business relations with Southeastern Pathology by continuing to solicit pathology work after the termination of the 2001 contract.

Following a trial on November 7, 2003, the jury, pursuant to a special interrogatory, determined that Whitaker had signed the addendum to the 2001 contract, and it awarded HCHA $146,000 in attorney fees pursuant to OCGA § 13-6-11 and $250,000 in punitive damages. Following this verdict, HCHA requested additional attorney fees pursuant to OCGA §§ 9-15-14 and 9-11-37 (c). The trial court denied HCHA's request. Both parties now appeal.

*Case No. A05A0473*

In this case, Whitaker contends that the trial court erred by: (1) denying his motion for j.n.o.v. regarding the jury's award of attorney fees pursuant to OCGA § 13-6-11; (2) denying his motion for j.n.o.v. regarding the jury's award of punitive damages; and (3) entering a judgment holding that he lost all privileges, both pathology and nonpathology, to practice at the Medical Center.

1. Whitaker contends that the trial court erred by denying his motion for j.n.o.v. regarding the jury's award of attorney fees pursuant to OCGA § 13-6-11, arguing, among other things, that HCHA failed to properly prove the amount of its attorney fees. We agree.

---

[5] Whitaker also sued Southeastern Pathology; however, Southeastern Pathology is not a party to this appeal.

[6] Whitaker asked the trial court to permanently enjoin HCHA from preventing him from exercising his privileges.

As a general rule, only a plaintiff is authorized to recover attorney fees under OCGA § 13-6-11. But where a defendant asserts an independent counterclaim, he may recover litigation expenses under OCGA § 13-6-11 in connection with that claim. *Gardner v. Kinney.*[7] The defendant is limited, however, to recovering only the portion of his attorney fees allocable to the prosecution of his counterclaim. *Arford v. Blalock.*[8] Therefore, [HCHA] had "the burden of proof and must segregate out the hours that are recoverable from those hours not recoverable. (Cit.)" *Southern Co. v. Hamburg.*[9] [HCHA] presented no evidence, however, "from which the jury could determine what portion of the total amount of attorney time and litigation expenses incurred . . . was attributable to [HCHA's] (counterclaim)." *Professional Consulting Svcs. &c. v. Ibrahim.*[10]

*Williamson v. Harvey Smith, Inc.*[11]

Here, HCHA wholly failed to establish the evidence it was required to present for the jury to be able to determine the attorney fees allocable to its counterclaims. For this reason, the trial court erred in denying Whitaker's motion for j.n.o.v. regarding the jury's award of attorney fees. We note that the verdict form submitted to the jury, which the parties agreed to without objection, did not require the jury to make a finding of either nominal or compensatory damages. And, in the absence of such a finding, an award of attorney fees is not appropriate. See, e.g., *Wade v. Culpepper.*[12] As the parties to this appeal have not raised this issue in the trial court or on appeal, we cannot consider same and it cannot form the basis for our opinion. The trial court's finding on this claim is reversed.

2. Whitaker contends that the trial court erred by denying his motion for j.n.o.v. regarding the jury's award of punitive damages, contending, among other things, that punitive damages were not authorized in conjunction with HCHA's breach of contract claim. We agree.

The record shows that HCHA argued alternatively to the jury that Whitaker either (1) defrauded it by indicating that he intended

---

[7] *Gardner v. Kinney*, 230 Ga. App. 771, 772 (498 SE2d 312) (1998).

[8] *Arford v. Blalock*, 199 Ga. App. 434, 439 (10) (405 SE2d 698) (1991).

[9] *Southern Co. v. Hamburg*, 233 Ga. App. 135, 139 (503 SE2d 383) (1998) (Eldridge, J., concurring specially).

[10] *Professional Consulting Svcs. &c. v. Ibrahim*, 206 Ga. App. 663, 666 (3) (426 SE2d 376) (1992).

[11] *Williamson v. Harvey Smith, Inc.*, 246 Ga. App. 745, 751 (8) (542 SE2d 151) (2000).

[12] *Wade v. Culpepper*, 158 Ga. App. 303, 305 (279 SE2d 748) (1981).

to sign the contract addendum but purposefully never did so or (2) signed the addendum and subsequently breached the contract. In its special interrogatory, the jury found HCHA's second breach of contract argument to be persuasive and determined that Whitaker had, in fact, signed the contract addendum.

> Because [HCHA's] only remaining claim[ ] [of the two posited was its] breach of contract claim[ ], [it] is limited to recovering damages "such as arise naturally and according to the usual course of things from such breach and such as the parties contemplated, when the contract was made, as the probable result of its breach." OCGA § 13-6-2. "It is well settled that punitive damages are not available in breach of contract claims." (Citation and punctuation omitted.) *Cline v. Lee.*[13]

*Monroe v. Bd. of Regents &c. of Ga.*[14] Accordingly, the trial court's findings on this claim are reversed.

3. Whitaker argues that the trial court erred by entering a judgment holding that he lost all privileges to practice at the Medical Center, contending, among other things, that the contract required only that he give up his pathology-related privileges, not his nonpathology-related privileges. Contrary to Whitaker's arguments, however, the contract he signed did not make the distinction he now attempts to impose upon it. To the contrary, the contract clearly states that, upon its expiration, the Medical Center retained the right to terminate the contracting physician's membership and *privileges*, without restriction. And, Whitaker's argument that the cancellation of privileges violated his right to due process contained in the Medical Center's bylaws does not change this result. Whitaker freely and explicitly waived his rights pursuant to the Medical Center bylaws when he signed the contract, and he cannot resurrect the rights that he voluntarily waived.

In addition, Whitaker claims that his contract with the Medical Center must be considered void as against public policy. Specifically, Whitaker contends that the contract inappropriately allows a public hospital to prevent qualified surgeons from practicing there without the necessary cause. A review of the relevant case law in this area, however, undermines Whitaker's contention.

---

[13] *Cline v. Lee*, 260 Ga. App. 164, 169-170 (2) (581 SE2d 558) (2003).
[14] *Monroe v. Bd. of Regents &c. of Ga.*, 268 Ga. App. 659, 665 (3) (602 SE2d 219) (2004).

This appeal represents a classic confrontation between two entities who play major roles in the health and welfare of the citizens of our state. The relationship which exists between hospital and physician is delicate, each one exercising exclusive as well as concentric areas of responsibility in the treatment and diagnosis of patients. In addition to the roles played by these two entities in providing this essential health service, the state has the duty of monitoring this function in order to protect the health and welfare of its citizens. "(T)he preservation of public health is one of the duties devolving on the state as the sovereign power, and the discharge of this duty is accomplished by means of the exercise of the inherent police power of the sovereign."

*Cobb County-Kennestone Hosp. Auth. v. Prince.*[15]
Furthermore,

[p]art of the responsibilities of a hospital authority is to insure that an adequate, competent medical staff serves the patients within the hospital. "It is generally agreed that the managing authorities of a hospital, under the power to adopt reasonable rules and regulations for the government and operation thereof, may, in the absence of any statutory restriction, prescribe the qualifications of physicians or surgeons for admission to practice therein." *Yeargin v. Hamilton Memorial Hospital*;[16] *Dunbar v. Hospital Authority of Gwinnett County.*[17] It naturally follows that a hospital authority has the power to revoke the staff privileges of a physician whom the Authority finds to be incompetent or who fails to comply with the reasonable rules and regulations as promulgated by the Authority. *Yeargin,* supra. Much of what the Hospital Authority regulates affects, to some degree, the physician's exercise of his medical judgment. The decision of what brand of thermometer, what type of syringe or, in this case, which type of C.A.T. scanner should be utilized by the hospital for its patients are administrative decisions. The physician's diagnosis is based upon his observations of the patient, tests performed and results reported to him by others. For example, a hospitalized patient may

---

[15] *Cobb County-Kennestone Hosp. Auth. v. Prince,* 242 Ga. 139, 143 (1) (249 SE2d 581) (1978).
[16] *Yeargin v. Hamilton Mem. Hosp.,* 229 Ga. 870, 872 (3) (195 SE2d 8) (1972).
[17] *Dunbar v. Hosp. Auth. of Gwinnett County,* 227 Ga. 534, hn. 1 (182 SE2d 89) (1971).

have his temperature and blood pressure taken and recorded by a nurse; a blood sample extracted and analyzed by a technician, utilizing the hospital's laboratory facilities; and may be x-rayed by a radiologist through use of equipment within the confines of the hospital facility. Although it is the physician who orders these tests and eventually evaluates their results applying his expert medical knowledge in arriving at his diagnosis, it is not the physician who undertakes their performance. The physician works within the hospital and relies upon it to provide diagnostic services, in return, agreeing to abide by the reasonable rules and regulations as set forth in the by-laws which the hospital enacts for its smooth operation.

(Footnote omitted.) *Cobb County-Kennestone Hosp. Auth.*, supra at 144-145 (1).

In this delicate balance, a physician's rights are certainly not absolute rights. For example,

[t]he physician's right may be contractually limited or waived by physicians who are associated with hospitals or clinics. Various services traditionally provided by specialists operating hospital specialty departments may be difficult to obtain on a regular basis unless the hospital enters into an exclusive contract. Contracts which limit the use of a hospital's facilities to certain specialists or which provide that all services of a particular type required by hospital patients be performed by the contracting specialists have been upheld by courts which have considered their validity.

(Punctuation and emphasis omitted.) *Cobb County-Kennestone Hosp. Auth.*, supra at 147 (1).

Physicians nonetheless may be offered a degree of protection from the bylaws of a hospital authority. However,

[o]ur courts have held that because hospitals have the authority to establish and revise rules and regulations governing the appointment of physicians to the hospital staff, medical staff bylaws alone do not create any contractual right to continuation of staff privileges. *Stein v. Tri-City Hosp. [Auth.]*[18] . . . Indeed, hospitals are entitled to change the staff bylaws or the terms of appointment even if that act

---

[18] *Stein v. Tri-City Hosp. Auth.*, 192 Ga. App. 289, 292-293 (384 SE2d 430) (1989).

results in the termination of a physician's staff privileges. *Stein*, supra; see *Alonso v. Hosp. Auth. of Henry County.*[19]

*St. Mary's Hosp. of Athens v. Radiology Professional Corp.*[20]
        With regard to a physician's rights to practice in a public hospital,

> the Supreme Court has recognized that although a physician has no absolute right to practice in a given public hospital, only a privilege, the physician is entitled to practice in the public hospitals as long as he complies with applicable laws, rules, and regulations, and such privileges may not be deprived by rules or acts that are unreasonable, arbitrary, capricious, or discriminatory. *Dunbar*[, supra at 540-541 (1)]. Given that hospitals cannot arbitrarily or capriciously deprive physicians of their privileges, the logical inference from this principle is that notwithstanding the broad power of a hospital authority to control the administrative, operational, and managerial functions of the facility and its staff, see *Cobb County-Kennestone*, supra, a public hospital authority cannot abridge or refuse to follow its existing bylaws concerning staff privileges. While the hospital has broad authority to change the bylaws, *Stein*, supra, it cannot refuse to follow existing bylaws. Consequently, given that a legal duty exists as to public hospitals, the violation of that duty is actionable under OCGA § 51-1-6.

(Emphasis omitted.) *St. Mary's Hosp.*, supra at 127 (3) (c). "Consequently, to ensure its right to terminate staff privileges to maintain exclusive relationships, hospitals must so provide either in the bylaws or in a contract with the individual physician (and not just in the contracts with the physician's professional corporation)." (Emphasis omitted.) Id.
        In light of this well-established law, Whitaker's argument that his exclusivity contract with the Medical Center was void because it resulted in the removal of all of his privileges must fail. There is no question that a hospital authority has the right to enter into an exclusive contract. In addition, it is clear that a physician may waive any rights he might otherwise have. Based on these rules alone, the facts in this case show that Whitaker signed a contract which clearly

---

[19] *Alonso v. Hosp. Auth. of Henry County*, 175 Ga. App. 198, 202-203 (6) (332 SE2d 884) (1985).
        [20] *St. Mary's Hosp. of Athens v. Radiology Professional Corp.*, 205 Ga. App. 121, 126 (3) (b) (421 SE2d 731) (1992).

stated that, at its expiration, Whitaker agreed to the removal of his privileges and waived his rights to contest this remedy.

And, Whitaker's contention that the exclusivity contract in this case must be considered void as an illegal restraint on his trade as a physician is misplaced. In support of this argument, Whitaker relies on *Hicks v. Doors By Mike*.[21] *Hicks*, which focused solely on a private corporation's covenant not to compete, is wholly distinguishable from the case now before us. Moreover, even if it were not, it cannot be said that, given Whitaker's attempts to maintain business with the pathology lab after his departure, the termination of Whitaker's staff membership and privileges in their entirety did not advance the Medical Center's legitimate business purpose of ensuring that it retained control over both its pathology lab and its premises in general. Therefore, Whitaker's contentions are without merit.

The law allows a hospital authority and its affiliates to enter and enforce contracts in order to properly administer a hospital. Whitaker thus has no grounds, public policy or otherwise, by which to attempt to revive the rights he willingly waived. We affirm the trial court's ruling on this issue.

## Case No. A05A0474

In this case, HCHA contends that the trial court erred by denying its two separate requests for attorney fees in accordance with (1) OCGA § 9-15-14 and (2) § 9-11-37 (c). In both instances, we affirm the rulings of the trial court.

4. HCHA contends that the trial court erred by denying its request for attorney fees pursuant to OCGA § 9-15-14 (a). This Code section provides:

> In any civil action in any court of record of this state, reasonable and necessary attorney's fees and expenses of litigation shall be awarded to any party against whom another party has asserted a claim, defense, or other position with respect to which there existed such a complete absence of any justiciable issue of law or fact that it could not be reasonably believed that a court would accept the asserted claim, defense, or other position. Attorney's fees and expenses so awarded shall be assessed against the party asserting such claim, defense, or other position, or against

---

[21] *Hicks v. Doors By Mike*, 260 Ga. App. 407 (579 SE2d 833) (2003).

that party's attorney, or against both in such manner as is just.

As a general rule,

[a]n award of attorney fees under OCGA § 9-15-14 (a) is appropriate when a party asserts a claim, defense, or other position with respect to which there existed such a complete absence of any justiciable issue of law or fact that it could not be reasonably believed that a court would accept the asserted claim, defense, or other position. Inherent in a ruling of the trial court denying attorney fees under OCGA § 9-15-14 (a) is a determination that there does not exist such a complete absence of any justiciable issue of law or fact that it could not be reasonably believed that a court would accept the asserted claim, defense, or other position. As in this case, where the trial court denies summary adjudication and where the claim had some factual merit or presented a justiciable issue of law, the denial of an award must be affirmed on any evidence.

(Citations, punctuation and emphasis omitted.) *Rental Equip. Group v. MACI, LLC.*[22]
In support of this claim, HCHA contends that Whitaker purposefully lied by testifying either that he did not sign the addendum to the 2001 contract with HCHA or that he did not remember doing so. In essence, HCHA argues that, because the jury found in a special interrogatory that Whitaker signed the addendum that the only conclusion, judged after the fact, was that Whitaker lied when he testified that he did not sign it. However, based on the testimony, the jury could have determined that Whitaker simply did not remember signing the contract, and there is some evidence which would support this conclusion. As Whitaker's lack of memory would not preclude a question of fact in this case, the trial court did not err by denying HCHA's claim for attorney fees.
5. HCHA contends that the trial court erred by denying its request for attorney fees pursuant to OCGA § 9-11-37 (c). This Code section provides:

If a party fails to admit the genuineness of any document or the truth of any matter as requested under Code Section

---

[22] *Rental Equip. Group v. MACI, LLC*, 263 Ga. App. 155, 164 (5) (a) (587 SE2d 364) (2003).

9-11-36 and if the party requesting the admissions thereafter proves the genuineness of the document or the truth of the matter, he may apply to the court for an order requiring the other party to pay him the reasonable expenses incurred in making that proof, including reasonable attorney's fees. The court shall make the order unless it finds that the request was held objectionable pursuant to subsection (a) of Code Section 9-11-36, or the admission sought was of no substantial importance, or the party failing to admit had reasonable ground to believe that he might prevail on the matter, or there was other good reason for the failure to admit.

Again, HCHA bases its argument in this regard on the contention that Whitaker purposefully lied that he did not sign the contract addendum. As pointed out above, however, there was some evidence on which the jury could have determined that Whitaker simply did not remember signing the addendum. As such, we cannot say that the trial court erred by finding that Whitaker had not failed to admit the truth of the matter. Accordingly, we cannot say that the trial court erred by denying HCHA's request for attorney fees pursuant to OCGA § 9-11-37 (c).

*Judgment affirmed in part and reversed in part in Case No. A05A0473. Judgment affirmed in Case No. A05A0474. Miller and Bernes, JJ., concur.*

DECIDED MARCH 25, 2005 —
RECONSIDERATION DENIED APRIL 15, 2005 —

*Chilivis, Cochran, Larkins & Bever, Anthony L. Cochran, John K. Larkins, Jr., Christopher J. McFadden,* for appellant.

*Hall, Booth, Smith & Slover, Rush S. Smith, Jr., Paul R. Koster, Walker, Hulbert, Gray, Byrd & Christy, Michael G. Gray,* for appellees.