A06A0368. SATILLA HEALTH SERVICES, INC. v. BELL et al.
A06A0369. SATILLA HEALTH SERVICES, INC. v. PILCHER et al.

(633 SE2d 575)

BERNES, Judge.

These companion appeals involve a dispute between a hospital and several physicians who held clinical privileges and practiced cardiology there. We must resolve two main issues. The first is whether a hospital that has entered into an exclusive provider contract with a physicians group can lawfully exclude all other physicians not employed by or under contract with that group from having access to the hospital's facilities and resources, irrespective of whether the hospital reserved the right to do so in its bylaws or in a contract with the individual physicians who are denied access. Resolution of this issue turns on whether the rule announced in *St. Mary's Hosp. of Athens v. Radiology Professional Corp.*, 205 Ga. App. 121 (421 SE2d 731) (1992) applies under the circumstances here. The second issue is whether, if *St. Mary's Hosp.* applies, the hospital complied with its ruling in this case. For the reasons discussed below, we agree with the trial court that *St. Mary's Hosp.* applies here. We further conclude that although it is well settled that hospitals may enter into exclusive provider contracts, the hospital's implementation of such a contract in this case was unreasonable because the hospital did not afford the excluded physicians the procedural protections set forth in *St. Mary's Hosp.* Accordingly, we affirm.

*Case No. A06A0368*

The record reflects that defendant Satilla Health Services, Inc. d/b/a Satilla Regional Medical Center (the "Hospital") is a private

nonprofit corporation that operates a hospital facility located in Ware County. From 1989 to 2001, plaintiff physicians Dr. Willie Bell and Dr. Joel Ferree practiced cardiology at the Hospital as members of Diagnostic Cardiology Associates, P.C. ("DCA").[1] In 2001, the Doctors left DCA and formed South Georgia Cardiology Associates, P.C. ("SGCA") as the sole corporate directors, officers, and shareholders. That same year, SGCA entered into an agreement with the Hospital under which SGCA would be the "exclusive provider of Cardiovascular Services" at the Hospital (the "Agreement").

Under the Agreement, SGCA agreed to provide "quality, continuous and uninterrupted Cardiovascular Services" at the Hospital through two physicians and two physician assistants ("PAs") who were subject to the Hospital's pre-approval. The Agreement recited: "Hospital hereby approves the following two (2) Physicians currently providing services at the Center: Dr. Joel Ferree and Dr. Willie Bell." The Agreement contemplated that SGCA might hire additional physicians in the future "through employment or through contract, subject to the Hospital's right to pre-approve such Physicians."

The Hospital and SGCA agreed that either party could terminate the Agreement at any time without cause by providing written notice to the other party at least 120 days prior to the termination. In turn, Paragraph 3 (b) (ii) of the Agreement provided that

> upon termination of this Agreement or an individual Physician's or PA's participation under this Agreement, all clinical privileges granted in connection with such Physician's services under this Agreement shall be automatically terminated, and termination of such privileges as a result of termination of this Agreement shall not entitle such Physician or PA so affected to any hearing or appeal process otherwise provided by Hospital's medical staff bylaws.

Agreement Paragraph 3 (b) (ii). Moreover, Paragraph 9 (a) stated that

> SGCA agrees on behalf of itself and each of the Physicians and PAs that, for a period of twelve (12) months following the date of termination of this Agreement or an individual Physician's or PA's participation under this Agreement, unless this Agreement is terminated by Hospital without cause, neither SGCA, the Physicians, nor the PAs will provide Cardiovascular Services in an office or any facility which is located within a twenty (20) mile radius of Hospital.

---

[1] Dr. Bell and Dr. Ferree will be referred to as "the Doctors."

Agreement Paragraph 9 (a).

Significantly, however, the Agreement also contained a separate "grandfather" provision. Paragraph 3 (e) provided that

> any physician currently appointed to the medical staff of Hospital who has been granted clinical privileges in cardiology as of the date [of] this Agreement . . . may continue to exercise those privileges in accordance with the medical staff bylaws and the Board Policy on Appointment, Reappointment, Clinical Privileges and Due Process of Satilla Health Services, Inc.

Agreement Paragraph 3 (e).

On June 19, 2001, the Doctors executed the Agreement, listing their respective "titles" as "President" and "Secretary" of SGCA. On February 11, 2002, the Doctors executed another version of the Agreement, listing their "titles" as "cardiologists." The Agreement signed on February 11, 2002 extended the initial three-year contract term from August 31, 2004 to December 31, 2004.

In a September 28, 2004 letter, the Doctors notified the Hospital that SGCA planned to terminate the Agreement. In the letter, the Doctors also stated that they planned to continue practicing cardiology at the Hospital in their personal capacities, pursuant to the clinical privileges that had been granted to them and renewed on an ongoing basis since 1989. The Doctors' position was that the Hospital could not automatically terminate their clinical privileges without violating the medical staff bylaws. The Doctors further contended that the Agreement did not bind them individually, but that even if it did, they could continue to exercise their privileges under the "grandfather" provision, Paragraph 3 (e).

In a January 26, 2005 letter, the Hospital notified the Doctors that as a result of the Agreement being terminated, their clinical privileges were being automatically terminated and that they would no longer be permitted to practice cardiology at the Hospital. The Hospital took the position that Paragraph 3 (b) (ii) of the Agreement specifically authorized the automatic termination of the Doctors' privileges, and that the noncompetition provision, Paragraph 9 (a), precluded the Doctors from continuing to practice cardiology at the Hospital.

On January 28, 2005, the Hospital entered into a contract with Baptist Specialty Physicians, Inc. ("Baptist Specialty"). Under the contract, Baptist Specialty would become the new "exclusive provider of Cardiology Services" at the Hospital.

On January 31, 2005, the Doctors filed their verified complaint seeking, among other things, an interlocutory and permanent injunction prohibiting the Hospital from limiting their ability to freely exercise their clinical privileges and practice cardiology in their personal capacities at the Hospital. On February 15, 2005, the trial court granted the requested interlocutory injunction after holding an evidentiary hearing.

Thereafter, the Hospital's board of directors adopted a resolution "to implement the exclusive contract" between the Hospital and Baptist Specialty (the "Resolution"). The Resolution provided that only physicians "employed by or under contract with" Baptist Specialty would be entitled to "use the space, equipment, facilities or personnel of the Hospital" to exercise their cardiology privileges as long as the exclusive provider contract remained in effect. Thus, the Resolution denied all other cardiologists who held privileges at the Hospital from having continued access to the Hospital's cardiology facilities and resources. However, the Resolution stated that "[t]he foregoing shall not constitute a revocation, suspension, limitation or termination of the clinical privileges of the affected physicians, and thus shall not entitle the affected physicians to a hearing or appeal pursuant to the Medical Staff Bylaws, Rules and Regulations, Credentialing Policy Manual or Fair Hearing Plan." The Resolution also carved out a temporary exception for the Doctors, stating that it would not apply to them for "only so long as" the trial court's injunction remained in effect.

Following passage of the Resolution, the Hospital moved for the trial court to dissolve the interlocutory injunction entered in favor of the Doctors. The Hospital also asked the trial court to enter an interlocutory injunction enjoining the Doctors from using the Hospital's cardiology facilities and resources in light of the Resolution.

After holding another evidentiary hearing, the trial court issued its order on March 26, 2005 denying the Hospital's motion. The trial court concluded that the Resolution would effectively terminate the Doctors' clinical privileges and, therefore, had to be analyzed under the framework of St. Mary's Hosp. of Athens, 205 Ga. App. 121. The trial court further ruled that the medical staff bylaws did not authorize the automatic termination of the Doctors' clinical privileges, and that the Hospital did not have individual contracts with the Doctors authorizing such automatic termination. Consequently, the trial court held that the Resolution was unlawful under St. Mary's Hosp. and could not be enforced against the Doctors.[2]

___

[2] The trial court went on to conclude that, even if the Agreement could be construed as binding on the Doctors individually, it did not authorize the Hospital's actions in this case.

On appeal, the Hospital contends that the trial court abused its discretion by failing to dissolve the interlocutory injunction previously entered in favor of the Doctors, and in failing to grant an interlocutory injunction in favor of the Hospital. The Hospital contends that regardless of whether it was entitled to automatically terminate the Doctors' clinical privileges under the Agreement, its board of directors was entitled to pass the Resolution restricting access to the Hospital's cardiology facilities and resources to physicians employed by or under contract with Baptist Specialty.

"Generally, the trial court has broad discretion to decide whether to grant or deny an interlocutory injunction. OCGA § 9-5-8." *Chaffin v. Calhoun*, 262 Ga. 202, 204 (415 SE2d 906) (1992). "[A] trial court's discretion in granting or denying an injunction will not be disturbed on appeal as an abuse of discretion unless there was no evidence upon which to base the ruling or it was based on an erroneous interpretation of the law." (Citation omitted.) *Atlanta Area Broadcasting v. James Brown Enterprises*, 263 Ga. App. 388, 393 (587 SE2d 853) (2003).

With these principles in mind, we turn to the relevant case law in this area. In *Cobb County Kennestone Hosp. Auth. v. Prince*, 242 Ga. 139, 143 (249 SE2d 581) (1978), the Supreme Court of Georgia stated:

> The relationship which exists between hospital and physician is delicate, each one exercising exclusive as well as concentric areas of responsibility in the treatment and diagnosis of patients. . . . As such, the legislature has seen fit to endow both physician and hospital with certain rights and restrictions in order to protect our citizens in the exercise of this essential health function.

With respect to hospitals, the Supreme Court emphasized that courts should defer to policies adopted by a hospital's board of directors in furtherance of the administration, operation, and control of the hospital. To that end, the Supreme Court held that courts "may not substitute [their] judgment for that of the [hospital] on matters relative to policy or good practice, which are purely administrative

---

Implicitly rejecting the argument that Paragraph 3 (b) (ii) applied to the Doctors, the trial court ruled that the "grandfather" provision, Paragraph 3 (e), preserved the Doctors' pre-existing clinical privileges and did not authorize their automatic termination. The trial court also found that the noncompetition provision did not apply in this case, but that even if it did, the provision was unenforceable because it was unreasonable, overly broad, and would unduly prejudice the interests of the public. Given our resolution of the case, we do not address these rulings by the trial court.

rather than legal in nature." Id. at 146. Rather, courts are limited to a determination of whether the hospital's actions were arbitrary and unreasonable. Id.

In *St. Mary's Hosp.*, 205 Ga. App. 121, this Court more specifically addressed under what circumstances a hospital board's decision to terminate a physician's clinical privileges in order to implement an exclusive provider contract with other physicians should be deemed arbitrary and unreasonable. As an initial matter, we recognized that a hospital "has the authority to establish exclusive relationships with physicians in a given specialty or area of practice and that such authority may include the concomitant right to terminate staff privileges as necessary to maintain this exclusivity." Id. at 127. See also *Cobb County Kennestone Hosp. Auth.*, 242 Ga. at 147, 149 (stating that "[c]ontracts which limit the use of a hospital's facilities to certain specialists or which provide that all services of a particular type required by hospital patients be performed by the contracting specialists have been upheld by courts which have considered their validity," and noting that these cases were "strikingly similar" to the present case and constituted "persuasive authority"); *Whitaker v. Houston County Hosp. Auth.*, 272 Ga. App. 870, 877 (3) (613 SE2d 664) (2005) ("There is no question that a hospital authority has the right to enter into an exclusive contract.").

However, we went on to recognize in *St. Mary's Hosp.* that a hospital board's ability to enter into an exclusive provider contract is not wholly unlimited and must be implemented in a manner that recognizes the rights and responsibilities of existing hospital medical staff in providing care to patients. We stated:

> With regard to public hospitals, the Supreme Court has recognized that although a physician has no absolute right to practice in a given public hospital, only a privilege, the physician is entitled to practice in the public hospitals as long as he complies with applicable laws, rules, and regulations, and such privileges may not be deprived by rules or acts that are unreasonable, arbitrary, capricious, or discriminatory. Given that hospitals cannot arbitrarily or capriciously deprive physicians of their privileges, the logical inference from this principle is that notwithstanding the broad power of a hospital authority to control the administrative, operational, and managerial functions of the facility and its staff, a public hospital authority cannot abridge or refuse to follow its existing bylaws concerning staff privileges. . . .
>
> Does the same duty devolve upon private hospitals? We hold that it does. Otherwise, the regulatory mandate that all

hospital authorities enact staff bylaws would be meaningless. Since the issue is existence of a legal duty to follow procedures established pursuant to state law, not the presence of state action, we see no reason to distinguish between public and private hospitals in this context. Both are required to establish staff bylaws; therefore, both should be required to follow those bylaws.

. . .

*Consequently, to ensure its right to terminate staff privileges to maintain exclusive relationships, hospitals must so provide either in the bylaws or in a contract with the individual physician (and not just in the contracts with the physician's professional corporation).*

(Citations omitted; emphasis supplied.) Id. at 127 (3) (c). Additionally, we pointed out that under certain circumstances, a physician may be found to have acquiesced and waived the right to insist on compliance with these procedural requirements prior to termination of his or her clinical privileges. See id. at 127-128 (3) (c). See also *St. Mary's Hosp. of Athens v. Cohen*, 216 Ga. App. 761, 761-762 (1) (456 SE2d 79) (1995) (hereinafter, "*St. Mary's Hosp. II*"). Only recently, we referred to *St. Mary's Hosp.* as "well-established law." *Whitaker*, 272 Ga. App. at 877 (3).

The Hospital argues that *St. Mary's Hosp.* has no bearing or application to its Resolution because that case allegedly sets forth the standards applicable only when a hospital terminates the clinical privileges of a physician. The Hospital emphasizes that, in contrast, the Resolution explicitly stated that it was not terminating the clinical privileges of the physicians not employed by or under contract with Baptist Specialty but instead was only foreclosing their *access to hospital facilities and resources*. The Hospital argues that this Court should recognize a legal distinction between denying a physician access to a hospital's facilities and resources on the one hand, and terminating his or her clinical privileges on the other, with *St. Mary's Hosp.* only applying in the latter circumstance.

We decline to recognize such a distinction, which is not supported by *St. Mary's Hosp.* In that case, we referred to a physician's existing clinical privileges as involving the right "to *practice* in the . . . hospital[ ] as long as he complies with applicable laws, rules, and regulations." (Emphasis supplied.) *St. Mary's Hosp.*, 205 Ga. App. at 127 (3) (c). In this regard, *St. Mary's Hosp.* followed *Dunbar v. Hosp. Auth. of Gwinnett County*, 227 Ga. 534, 540 (182 SE2d 89) (1971), where the Supreme Court referred to a physician's clinical privileges as "a privilege to *practice* his profession." (Emphasis supplied.) See

also OCGA § 31-7-7 (a) (treating the term "privileges" as synonymous with "permission to treat patients" and with the "privilege[ ] . . . to practice in such hospital").[3] Given how clinical privileges have been defined by Georgia law, we are unpersuaded by the Hospital's attempt to draw a distinction between terminating clinical privileges and denying access to hospital facilities and resources.

In any event, the distinction drawn by the Hospital would eviscerate the holding in *St. Mary's Hosp.* by giving hospital boards of directors the ability to easily circumvent the specific protections afforded physicians in that case. The procedural protections enunciated in *St. Mary's Hosp.* would be rendered a nullity if a hospital board could avoid those protections by simply re-casting its decision as a "denial of access to hospital facilities and resources" rather than a "termination of privileges."

The case at hand illustrates this point. On January 26, 2005, the Hospital informed the Doctors that their decision to terminate the Agreement would "culminate in the termination of [their] privileges" and, as a result, there would "be no further direct patient care" by the Doctors, and the Hospital would be "disabling their access to clinical systems." It was not until the trial court entered its initial order granting an interlocutory injunction in favor of the Doctors that the Hospital passed the Resolution denying physicians access to facilities and resources and stating that the prohibition "shall not constitute a revocation, suspension, limitation or termination of the clinical privileges of the affected physicians." Thus, the present case illustrates how the distinction advocated by the Hospital would easily result in the circumvention of *St. Mary's Hosp.*, even though the practical effect on the physicians would be the same regardless of whether their privileges were "terminated" or they were denied hospital access.

Furthermore, the distinction drawn by the Hospital is not supported by the Hospital's "Medical Staff Bylaws." The bylaws provide that physicians with clinical privileges are entitled to *"[e]xercise* the privileges granted without limitation, except as otherwise provided

---

[3] OCGA § 31-7-7 (a) provides in part:

Whenever any licensed doctor of medicine, doctor of podiatric medicine, doctor of osteopathic medicine, or doctor of dentistry shall make application for *permission to treat patients in any hospital* owned or operated by the state, any political subdivision thereof, or any municipality, the hospital shall act in a nondiscriminatory manner upon such application. . . . This subsection shall apply solely to applications by licensed doctors of medicine, doctors of podiatric medicine, doctors of osteopathic medicine, and doctors of dentistry who are not members of the staff of the hospital *in which privileges are sought* at the time an application is submitted and by those not *privileged*, at such time, *to practice in such hospital* under a previous grant of privileges.

(Emphases supplied.)

in the Medical Staff Rules and Regulations, or by specific privilege restriction." (Emphasis supplied.) Medical Staff Bylaws, Art. IV, § I.B.1. Thus, under the bylaws, the grant of clinical privileges necessarily included the right to exercise those privileges in the Hospital's facilities, unless there was a regulation or "specific privilege restriction" stating otherwise. And, as explained infra, there is no such regulation or "specific privilege restriction" applicable here.

Nor is the Hospital's position supported by its "Medical Staff Rules and Regulations." The rules and regulations refer to medical staff as being "persons who are *privileged to engage in* the evaluation, diagnosis, and treatment of patients admitted to" the Hospital. (Emphasis supplied.) Medical Staff Rules and Regulations, Definitions, at p. 2. Such phraseology draws no distinction between having privileges and being able to exercise those privileges in the Hospital's facilities.

Likewise, the Hospital document setting forth the cardiology privileges awarded to the Doctors does not draw a distinction between having privileges and having access to the Hospital's facilities and resources to exercise them. The "Core Privileges in Cardiovascular Medicine (Cardiology)" awarded to the Doctors explicitly included, with certain exceptions, "[p]rivileges to admit, evaluate, diagnose, and provide treatment or consultative services to patients of all ages," which clearly presupposed that the privileges awarded to the Doctors included the right to use the Hospital's facilities and resources. See Core Privileges in Cardiovascular Medicine (Cardiology), Privileges Included in the Core.

For the foregoing reasons, we agree with the trial court that enforcing the Resolution against the Doctors would effectively terminate their clinical privileges, and, therefore, would require compliance with the procedural protections afforded to physicians in *St. Mary's Hosp.*[4] Accordingly, the Hospital would be entitled to automatically terminate the Doctors' privileges by way of its Resolution only if it reserved the right to do so in the bylaws or in individual contracts with the Doctors, or, alternatively, if the Doctors acquiesced and waived their right to challenge an automatic termination of their privileges. See *Whitaker*, 272 Ga. App. at 877 (3); *St. Mary's Hosp. II*, 216 Ga. App. at 762-763 (1); *St. Mary's Hosp.*, 205 Ga. App. at 127-128 (3) (c). We will address each possibility in turn.

---

[4] Both parties cite to cases from foreign jurisdictions to support their respective positions over whether the termination of clinical privileges and the denial of access to hospital facilities and resources should be treated as synonymous. Because we have concluded that the present case is controlled by the binding Georgia precedent of *St. Mary's Hosp.* and by the specific wording of the bylaws, regulations, and cardiology privileges at issue here, we decline to address foreign law.

1. *The Bylaws*. The Hospital argues that the trial court erred in holding that the medical staff bylaws did not authorize the Hospital's board of directors to pass the Resolution and automatically terminate the Doctors' privileges in order to implement the exclusive provider contract with Baptist Specialty. We disagree.

Article IX, Section II of the medical staff bylaws lists several special circumstances under which a physician's privileges can be and are automatically suspended or revoked, but implementation of an exclusive provider contract is not one of the listed circumstances. In contrast, Article IX, Section III of the bylaws then provides a list of actions taken by the Hospital that entitle a physician to an administrative hearing and appeal, a list which includes, without qualification, the "reduction" or "revocation" of clinical privileges. See Medical Staff Bylaws, Art. IX, § III.E, F. These provisions, when read together, show that an automatic termination of the Doctors' clinical privileges in order to implement an exclusive provider agreement was not authorized under the bylaws.

The Hospital argues that the Resolution was sufficient to authorize the automatic termination of the Doctors' privileges because the medical staff bylaws provide that physicians are subject to Hospital "policies." See Medical Staff Bylaws, Art. III, §§ I, VIII.G. However, the medical staff rules and regulations reflect that "policies" refer to specific matters addressed by a particular Hospital department or specialty which are contained in a departmental policy manual. See Medical Staff Rules and Regulations, Art. XI. The Resolution does not fit within that definition.

The Hospital further emphasizes that the medical staff bylaws provide that physicians are entitled to "[e]xercise the privileges granted without limitation, *except as otherwise provided in the Medical Staff Rules and Regulations, or by specific privilege restriction.*" (Emphasis supplied.) Medical Staff Bylaws, Art. IV, § I.B.1. However, there are no provisions in the medical staff rules and regulations that reserve the right for the Hospital to automatically terminate privileges in order to implement an exclusive provider contract. Nor can the Resolution be considered a "specific privilege restriction." The Resolution did far more than simply restrict existing clinical privileges — it effectively terminated them altogether.

Under these circumstances, the Hospital board of director's passage of the Resolution automatically terminating clinical privileges to implement the exclusive provider contract was not authorized by the bylaws. Hence, *St. Mary's Hosp.* was not complied with in this regard.

2. *Individual Contracts with the Doctors*. As previously noted, on June 19, 2001, the Doctors executed the Agreement, listing their respective "titles" as "President" and "Secretary" of SGCA, and on

February 11, 2002, they executed another version of the Agreement but listed their "titles" as "cardiologists." All parties agree that the 2001 Agreement was between the Hospital and SGCA. But, the Hospital contends that the trial court should have concluded that the 2002 Agreement constituted a contract between the Hospital and the Doctors in their individual capacities, authorizing the automatic termination of their clinical privileges under Paragraph 3 (b) (iii). We cannot agree.

> There are three steps in contract construction: the trial court must first decide whether the contract language is unambiguous; if it is ambiguous, the trial court must then apply the applicable rules of construction; and if an ambiguity still remains, the jury must then resolve the ambiguity. An ambiguous contract is construed most strongly against its maker, but the cardinal rule of contract construction is to ascertain the intention of the parties.

(Punctuation and footnotes omitted.) *Rodriguez v. Miranda,* 234 Ga. App. 779, 781 (1) (507 SE2d 789) (1998).

Here, the trial court properly concluded that, as a matter of law, both the 2001 and 2002 Agreements were between the Hospital and the Doctors' professional corporation, SGCA. As an initial matter, we note that the Hospital predicates its argument on the assumption that the 2001 and 2002 Agreements contain identical terms. However, the 2002 Agreement extended the initial three-year contract term from August 31, 2004 to December 31, 2004. Hence, the 2001 and 2002 Agreements were not simply redundant; instead, the 2002 Agreement *succeeded* the 2001 Agreement. This interpretation is buttressed by the fact that both Agreements recited that they were "by and between Satilla Health Services, Inc. d/b/a Satilla Regional Medical Center, a Georgia nonprofit corporation . . . and South Georgia Cardiology Associates, P. C., a Georgia professional corporation." Additionally, the header for the signature line of both Agreements was in the name of the corporate entity, SGCA. In light of these recitals and signature headings, combined with the fact that the 2001 and 2002 Agreements contained different terms, we conclude that the substance of the writings showed that the Doctors signed both Agreements in their representative capacities on behalf of SGCA. See, e.g., *Swiss Bank Corp. v. Thomas, Conner & McDonald, P.A.,* 236 Ga. App. 890, 892 (514 SE2d 68) (1999); *Rodriguez,* 234 Ga. App. at 784 (3).

It is true, as the Hospital points out, that the Doctors listed their "titles" in the 2002 Agreement as "cardiologists." The Hospital argues that this demonstrates that the Doctors intended to sign the 2002

Agreement in their individual capacities.[5] However, given the recital and signature heading listing SGCA as the contracting party, the Doctors' use of the title "cardiologists" at most created an internal ambiguity in the 2002 Agreement allowing for the consideration of parol evidence. See *Brevard, Inc. v. Broadwater Mgmt.*, 235 Ga. App. 496, 498 (1) (b) (508 SE2d 747) (1998). And, the parol evidence of record demonstrates conclusively that there was no contract intended between the Hospital and the individual Doctors: the Hospital's president and chief executive officer testified, consistent with Dr. Bell's testimony at the same evidentiary hearing, that there never was a contractual agreement between the Hospital and the individual Doctors.

Accordingly, the trial court properly found that the Hospital never entered into an individual contract with the Doctors permitting it to automatically terminate their clinical privileges.[6] Compare *Whitaker*, 272 Ga. App. at 871, 878 (3) (physician not entitled to challenge automatic termination of his privileges when he signed separate contract addendum specifically stating that he personally agreed to the termination of his privileges if contract with professional corporation ended). The standard enunciated in *St. Mary's Hosp.* thus was not satisfied.

3. *Acquiescence and Waiver.* In *St. Mary's Hosp. II*, 216 Ga. App. at 762-763 (1), we held that a physician had acquiesced to the automatic termination of his privileges when he periodically received a letter from the hospital, in conjunction with the renewal of his privileges, which stated that his privileges would be automatically terminated if the contract with his professional corporation itself ended. In contrast, in the present case, the documents memorializing the renewal of the Doctors' privileges simply stated: "In exercising any clinical privileges, I am constrained by hospital and medical staff bylaws, rules and regulations, and policies." As discussed supra, none of the bylaws, rules and regulations, or policies contained in the record authorized the automatic termination of clinical privileges to implement an exclusive provider contract, and so the renewal of the

---

[5] The Hospital contends that even if the Doctors signed the 2002 Agreement in their representative capacities, they should be bound to the contract individually based on agency and estoppel principles. But, the unequivocal language of *St. Mary's Hosp.* emphasizes that the right to terminate privileges must be "in a contract with the *individual* physician (and not just in the contracts with the physician's professional corporation)." (Emphasis in original.) *St. Mary's Hosp.*, 205 Ga. App. at 127 (3) (c).

[6] Likewise, because the Doctors were not parties to the 2001 or 2002 Agreement, the noncompetition covenant contained therein could not be enforced against them individually. See *Wallace Business Forms v. Elmore*, 221 Ga. 223, 224 (144 SE2d 82) (1965) (restrictive covenant could not be enforced against defendants who were not parties to the contract containing the covenant); *Bennett v. Kimsey*, 218 Ga. 470, 475 (4) (128 SE2d 506) (1962).

Doctors' privileges in itself would not support a finding of acquies-
cence or waiver. Nor has the Hospital pointed to any other conduct by
the Doctors of the unequivocal type found in *St. Mary's Hosp. II* that
would justify a finding of acquiescence in this case.[7]

For these reasons, we conclude that the trial court did not err in
ruling that the Hospital failed to comply with the procedural protec-
tions set forth in *St. Mary's Hosp.* and its progeny in attempting to
automatically terminate the Doctors' clinical privileges. As such, the
trial court did not abuse its discretion in refusing to dissolve the
interlocutory injunction entered in favor of the Doctors or to enter an
interlocutory injunction enjoining them from using the Hospital's
cardiology facilities and resources.[8]

### Case No. A06A0369

Dr. Pilcher and the other plaintiff physicians in Case No. A06A0369
are current members of DCA who practiced cardiology at the defen-
dant Hospital alongside the Doctors for several years.[9] The DCA
Physicians were not parties to the 2001 or 2002 Agreement between
the Hospital and SGCA. However, the DCA Physicians continued
practicing cardiology at the Hospital pursuant to the clinical privi-
leges that they had been previously granted, which all parties agree
was contemplated by Paragraph 3 (e) of the Agreement.

The Resolution passed by the Hospital's board of directors,
discussed supra, automatically excluded the DCA Physicians from
having continued access to the Hospital's facilities and resources as
part of the implementation of the Hospital's exclusive provider
contract with Baptist Specialty. As a result, the DCA Physicians filed
a verified complaint against the Hospital seeking, among other
things, an interlocutory and permanent injunction enjoining the
Hospital from implementing the Resolution.

After holding an evidentiary hearing consolidated with the one
held in Case No. A06A0368, the trial court entered an order granting
an interlocutory injunction in favor of the DCA Physicians that
enjoined the Hospital from interfering with their ability to exercise

---

[7] A finding of acquiescence or waiver could not be based on the 2001 and 2002 Agreements
entered between the Hospital and SGCA, for the same reason discussed supra in footnote 5.

[8] The Hospital also enumerates as error the trial court's grant of the Doctors' motion for a
preliminary injunction on February 15, 2005. However, in its argument section addressing this
enumeration, the Hospital incorporates by reference the same arguments and citation to
authorities discussed above. As such, we conclude that the trial court did not err in granting the
Doctors' motion for a preliminary injunction for the same reasons previously discussed in our
opinion.

[9] Dr. Pilcher and the other plaintiff physicians in Case No. A06A0369 will be referred to as
"the DCA Physicians."

their clinical privileges and to use the facilities and resources of the Hospital. The trial court relied upon the same reasoning set forth in its March 26, 2005 order in Case No. A06A0368.

For the same reasons previously discussed, the framework enunciated in *St. Mary's Hosp.* controls in this case. As we noted, the Resolution was not authorized by the Hospital's bylaws. Furthermore, the Hospital did not have individual contracts with the DCA Physicians, and the Hospital has failed to point to any record evidence of acquiescence or waiver. Accordingly, the Hospital's actions taken against the DCA Physicians were unlawful under *St. Mary's Hosp.* The trial court did not abuse its discretion in granting the DCA Physician's request for an interlocutory injunction.

In conclusion, we reiterate that hospital boards are to be accorded substantial deference in carrying out the administration, operation, and control of hospitals, and that Georgia law makes clear that hospitals are entitled to enter into exclusive provider contracts as part of their administration and management of hospital affairs. Significantly, however, binding Georgia precedent also recognizes that physicians with hospital privileges have responsibilities over patient care that justify affording them certain procedural protections that must be complied with when implementing exclusive provider contracts. It is with these protections the Hospital failed to comply in this case.

*Judgment affirmed. Andrews, P. J., and Barnes, J., concur.*

DECIDED JUNE 23, 2006 —

*Dillard, Bower & Crowley, Terry A. Dillard, Scott C. Crowley, Roy E. Barnes*, for appellant.

*Brown, Readdick, Bumgartner, Carter, Strickland & Watkins, John E. Bumgartner, Bradley J. Watkins, Balch & Bingham, Michael J. Bowers, T. Joshua R. Archer, Futch & Bowen, Kenneth E. Futch, Jr.*, for appellees.

*Parker, Hudson, Rainer & Dobbs, Thomas D. Watry, Alston & Bird, Jack S. Schroder, Jr., Brian W. Looby*, amici curiae.